**CELLULAR TELEPHONE COMPANY, d/b/a AT & T Wireless Services formerly known as Cellular One®, New York SMSA Limited Partnership and its General Partner Cellco Partnership, d/b/a Bell Atlantic Nynex Mobile, and Smart SMR of New York, Inc., d/b/a Nextel Communications, Plaintiffs,**

**v.**

**ZONING BOARD OF ADJUSTMENT OF THE BOROUGH OF HO–HO–KUS, Defendant.**

**No. Civ.A. 97–3408 MTB.**

United States District Court, D. New Jersey.

Oct. 28, 1998.

---

Thomas F. Campion, Jr., Shanley & Fisher, Morristown, NJ, for Plaintiffs.

David L. Rutherford, Ridgewood, NJ, for Defendant.

## OPINION

BARRY, District Judge.

This matter comes before the court on the parties' cross-motions for summary judgment as to Count I of the complaint filed by plaintiffs Cellular Telephone Company, d/b/a AT & T Wireless Services ("AT & T Wireless"), New York SMSA Limited Partnership and its general partner Cellco Partnership, d/b/a Bell Atlantic Nynex Mobile ("BANM"), and

SMART SMR of New York, Inc., d/b/a Nextel Communications ("Nextel") (collectively as "plaintiffs"). In Count I, plaintiffs assert that the Zoning Board of Adjustment of the Borough of Ho–Ho–Kus ("Board" or "defendant") violated Section 704 of the Telecommunications Act of 1996 ("TCA" or "the Act") when it denied plaintiffs'[1] application for variances to construct a wireless telecommunications facility on Lots 3 and 4 in Block 603 of the Borough of Ho–Ho–Kus ("proposed site" or "leased property" or "Borough property"). For the reasons that follow, this court will deny plaintiffs' motion and grant defendant's motion.

## I. *Factual Background*

The parties have stipulated to the following facts. BANM and AT & T Wireless are licensed by the Federal Communications Commission ("FCC") to provide wireless cellular phone service to the Borough of Ho–Ho–Kus while Nextel is licensed to provide wireless mobile radio services. *See* February 23, 1995 Hearing at 63–64; April 13, 1995 Hearing at 157, 166.[2] On August 2, 1994, AT & T Wireless,[3] as the lead carrier of the three plaintiffs, entered into a land lease agreement with Ho–Ho–Kus to lease a 2,350 square foot portion of property owned by the Borough in order to erect a wireless telecommunications facility. *See* August 27, 1998 Cespedes Cert. at Exh. A. The lease contemplated that the facility would consist mainly of a wireless communications monopole, associated antennas, related equipment shelters, and fencing. *Id.* BANM and Nextel then entered into co-location agreements with the Borough in order to install antennas upon the same monopole and utilize a portion of the equipment shelters. *Id.* The lease agreement with AT & T Wireless was contingent upon the procurement of the required zoning variances, special use permits and building permits. *Id.* ¶ 7(a).

The proposed site is located in a R–2 residential zone. *See* Stipulation of Facts in Final Pretrial Order ¶ 3(46). The site is not now used for residential purposes, however, and a Department of Public Works ("DPW") salt storage barn with accompanying fencing, among other things, is currently located on the northwest corner of the property. *Id.;* April 20, 1995 Hearing at 23.

On September 3, 1994, plaintiffs applied to the Zoning Official for the Borough of Ho–Ho–Kus for variances necessary to construct three buildings, a 125–foot monopole with antennas reaching as high as 127 feet, and a six-foot high barbed wire fence to surround the facility. Stipulation of Facts in Final Pretrial Order ¶ 3(18–19). The proposed monopole would be a cylindrical galvanized steel structure measuring three feet in diameter at its base and eighteen inches in diameter at the top. *Id.* ¶ 3(20). The twenty seven antennas in a 360 degree array would be attached to the monopole to accommodate all three providers. *Id.* The site would be unmanned and would be visited approximately once a month for maintenance.

The application was denied by the Zoning Official on September 16, 1994. *Id.* ¶ 3(18); April 20, 1995 Hearing at 63. On August 28, 1995, plaintiffs amended the application, reducing the number of equipment shelters from three to two, modifying their size, relocating the layout of the buildings and the monopole within the proposed site, and reducing the height of the fence from six to five feet. Stipulation of Facts in Final Pretrial Order ¶ 3(22–23). The Zoning Official denied plaintiffs' amended application. *Id.* ¶ 3(24).

The application and amended application were thereafter brought before the Borough's Zoning Board of Adjustment for thirteen variances from the Zoning Ordinance of the Borough ("Zoning Ordinance"). Over the course of two and one-half years, forty-four public hearings were conducted before

---

**1.** Although the lead plaintiff, AT & T Wireless, submitted the applications before the Zoning Official and Zoning Board on behalf of itself, BANM and Nextel, this court will refer to the plaintiffs collectively throughout this opinion because all three challenge the denial.

**2.** Plaintiffs have submitted the complete transcripts of the public hearings conducted by the Board over the course of two and one-half years. This court will refer to a particular transcript by its date.

**3.** At the time the lease was signed, plaintiff AT & T Wireless was known as Cellular One®.

the Board regarding plaintiffs' application and amended application. *Id.* ¶ 3(25). On April 24, 1997, the Zoning Board voted to deny plaintiffs' application and memorialized its decision in a thirty-six page resolution adopted on June 5, 1997 (the "Resolution"). *Id.* ¶ 3(34–35); August 27, 1998 Cespedes Cert. at Exh. E. The Resolution concluded as follows:

> [T]he public interest which will be served by the proposed monopole is not substantial, as the quality of cellular telephone service already being provided within the Borough of Ho–Ho–Kus is adequate ... The Board [also] finds that the site is inappropriate for that use, given its already congested nature, and [the fact that] numerous bulk variances are required, including one related to the required setback of the structure from the property lines. The Board also finds that the construction of the monopole will have a substantially detrimental impact upon the public good and the purpose and intent of the zone plan and ordinance based upon a significant detrimental visual impact, the construction of such a massive structure on a relatively tiny piece of property, and a significant decline in real property values. The Board finds that on balance ... the balance must be struck in favor of denying the application. The public good being served is not compelling. Due to the nature of the structure, no conditions can be imposed that would reduce the impact, and on balance the negative considerations outweigh the benefits to be obtained.

This action challenging the Board's denial as violative of the TCA and state law followed.

## II. *Discussion*

Generally, a federal court does not second-guess or otherwise interfere with the decisions of local zoning boards. With the amendment of the Federal Telecommunications Act in 1996, however, limited substantive and procedural restrictions were placed upon state and local government regulation of personal wireless service facilities. With respect to the enforcement of these provisions, the TCA states that "[a]ny person adversely affected by any final action or fail-

ure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may ... commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v). This court, therefore, has jurisdiction, pursuant to 28 U.S.C. § 1331, to evaluate the Board's compliance with the TCA.

Summary judgment may be granted if, after consideration of such items as depositions, affidavits or certifications, and after viewing the facts in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed .R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The parties concede, and this court agrees, that no material facts are in dispute and that summary judgment is appropriate. The bottom-line question, of course, is which of the parties will be the worthy recipient or recipients.

In Count I, plaintiffs allege that the Board's June 5, 1997 denial of the application for thirteen variances from the Zoning Ordinance violated several substantive and procedural provisions of the TCA. Specifically, plaintiffs contend that the Board's denial: (1) was not rendered within a reasonable time; (2) was not supported by substantial evidence; (3) amounted to unreasonable discrimination against providers of functionally equivalent personal wireless services; and (4) prohibited or had the effect of prohibiting personal wireless service. *See* 47 U.S.C. § 332(c)(7)(B)(i–iii). This court does not agree.

### A. *Decision Issued within Reasonable Time*

The TCA provides that a state or local government shall act on a request for authorization to construct a personal wireless facility "within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request." 47 U.S.C. § 332(c)(7)(B)(ii). In support of their argument that the Board violated this provision, plaintiffs complain that the Board took approximately two and one-half years to ren-

der a decision on the application and "neglected to issue a written decision ... [until] more than one month after a vote on the application was taken." Pl.Mem. in Supp. of Mot. for Summ.J. at 17.

 The amount of time which elapsed while plaintiffs' application was pending is not dispositive as to whether there was unreasonable delay because "each situation must be independently examined." *Virginia Metronet, Inc. v. Board of Supervisors of James City County, Virginia*, 984 F.Supp. 966, 977 (E.D.Va.1998). An examination of this "situation" compels the conclusion that the Board rendered its decision within a reasonable time. From the outset—notably over a year before the enactment of the TCA—the Board attempted to provide a fair and public forum for the examination of the application. The hearings before the Board were conducted in quasi-judicial fashion, using the rules of evidence as guidelines. The Board permitted appropriate cross-examination, reasonably accommodated the parties— including plaintiffs—when witnesses were unavailable, and limited public questioning to relevant issues. Testimony was taken over numerous days, the majority of the witnesses were called by plaintiffs, and plaintiffs' direct case, rebuttal, and counter-rebuttal filled approximately twenty-three of the thirty-seven days not devoted to the Board deliberations or the parties' summations. Although the process took considerably longer than the 120 days contemplated by New Jersey law, *see* N.J.S.A. 40:55D–73 (stating that the board of adjustment shall render a decision not later than 120 days from the decision of an administrative officer), plaintiffs consistently consented to extensions of time[4] and never complained to the Board that the time spent on the application was violative of the TCA. Indeed, in an effort to expedite the application, the Board expanded its customary schedule of holding one meeting a month and conducted additional meetings during many months, culminating in four meetings a month during the final deliberations. There

is no evidence of any intent to keep plaintiffs "tied up in the hearing process[,]" *Sprint Spectrum L.P. v. Town of Easton*, 982 F.Supp. 47, 50 (D.Mass.1997) (citation omitted). Rather, the Board acted conscientiously, affording all parties, including the public, a fair and full opportunity to be heard.

██ Certainly, too, the Board acted within a reasonable time in rendering its written decision approximately one month after it voted to deny the application; indeed, the Resolution was issued within the forty-five days contemplated by the Municipal Land Use Law ("MLUL"). *See* N.J.S.A. 40:55D–10g(2) (allowing municipal agency forty-five days to memorialize resolution granting or denying approval). In any event, the TCA requires that the Board's denial be in writing and supported by substantial evidence. *See* 47 U.S.C. § 332(c)(7)(B)(iii). Presumably in order to comply with this requirement, the comprehensive thirty-six page Resolution detailed the evidence upon which the Board relied and the conclusions which it reached. Taking approximately one month to do so was eminently reasonable.

**B.** ***Decision Based on Substantial Evidence***

██ Plaintiffs argue next that the Board's decision was not supported by substantial evidence and thus was violative of the TCA. As noted above, the TCA instructs that "[a]ny decision by a State or local government or instrumentality [ ] to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence...." 47 U.S.C. § 332(c)(7)(B)(iii). The substantial evidence standard "is the traditional standard used for judicial review of agency actions." H.R.Conf.Rep. No. 104–458, at 445–48 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 223; *Century Cellunet of Southern Michigan, Inc. v. City of Ferrysburg*, 993 F.Supp. 1072, 1077 (W.D.Mich.1997); *Bell-South Mobility*, 944 F.Supp. at 928.

---

**4.** *See, e.g.*, May 25, 1995 Hearing at 4 (agreeing to extension). Plaintiffs admit to consenting to extensions, explaining that "any agreement to extend the Board's time to make a decision on this case was made in good faith, in an effort to

present credible testimony to the Board in order to enable it to make the correct decision, and to refute the scientifically unsound evidence offered by opponents of the variances." Pl.Mem. in Opp. to Def.'s Mot. for Summ.J. at 9.

In the context of review of agency decisions, substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)); *see also Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (clarifying that a "large or considerable amount of evidence" is not required); *Alexander v. Shalala,* 927 F.Supp. 785, 791 (D.N.J.1995) (defining substantial evidence as "more than a mere scintilla, but may be less than a preponderance") (citation omitted), *aff'd,* 85 F.3d 611 (3d Cir.1996). Under this definition, a court may not displace an agency's "choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo.*" *NLRB v. Greensburg Coca–Cola Bottling Co., Inc.,* 40 F.3d 669, 673 (3d Cir.1994) (*quoting Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Likewise, in the context of the TCA, the court must affirm a board's decision "even if the court would decide the matter differently." *Century Cellunet,* 993 F.Supp. at 1077; *see also AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach,* 155 F.3d 423, 430 (4th Cir.1998).

That having been said, however, all evidence must have been considered by the Board, adequate explanations for rejecting relevant evidence must have been provided, and the Board's decision must have been "accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris,* 642 F.2d 700, 704 (3d Cir. 1981). Thus, while the Board's decision is afforded deference with the burden on plaintiffs to overturn that decision, *Century Cellunet,* 993 F.Supp. at 1077, this court must scrutinize the entire record and determine whether the decision is rational and supported by substantial evidence.

In order to determine whether the Board's decision was based on substantial evidence, this court must closely examine New Jersey zoning law. Plaintiffs repeatedly urge this court not to consider the Board's discussion of state law issues because, they contend, the TCA overrides state authority in the area of wireless communications. *See, e.g.,* Pl.'s Mem. in Reply to Def.'s Reply Mem. at 1–2; Pl.'s Mem in Opp. to Def.'s Mot. for Summ.J. at 2. Contrary to plaintiffs' contention, however, state zoning law directly informs this court's determination as to whether the Board based its decision on substantial evidence.

The TCA explicitly preserves local zoning authority unless the local or state government or instrumentality unreasonably discriminates against providers of personal wireless service, prohibits the provision of such service, or regulates the placement of wireless service facilities on the basis of the environmental effects of radio frequency emissions if the emissions comply with the Commission's regulations. *See* 47 U.S.C. § 332(c)(7)(B)(i) and (iv). Otherwise, however, the requirement of the TCA that a denial by a state or local government or instrumentality be in writing and based upon substantial evidence "does not affect or encroach upon the substantive standards to be applied under established principles of state and local law." *AT & T Wireless Services of Florida, Inc. v. Orange County,* 994 F.Supp. 1422, 1426 (M.D.Fla.1997). The purpose of this requirement is to facilitate review and to assure that decisions are not made arbitrarily or without sufficient justification. *Id.*

Here, application was made to the Board for variances from the Zoning Ordinance to permit the construction of a wireless communication monopole and accompanying buildings. Because the Board found that the proposed facility should be considered a "public utility" within the meaning of Section 85–44 of the Zoning Ordinance, it determined that a conditional use variance was necessary. In order to meet the standard for a conditional use variance—a type of "d" variance under N.J.S.A. 40:55D–70d(3)—an applicant must establish so-called "positive" and "negative" criteria. The positive criteria generally require the applicant to establish "special reasons" for the variance, while the negative criteria require proof that the variance can be granted "without substantial det-

riment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D–70d.

 Adding another layer to the analysis, the positive and negative criteria are evaluated slightly differently depending on whether the proposed use is "inherently beneficial."[5] If the conditional use is not inherently beneficial, the applicant must establish special reasons for the variance—the positive criteria—by showing that the site is "an appropriate site for the conditional use notwithstanding the deviations from one or more conditions imposed by the ordinance." *Coventry Square, Inc. v. Westwood Zoning Board of Adjustment,* 138 N.J. 285, 298, 650 A.2d 340 (1994). The negative criteria then focus on the effect the proposed conditional use variance will have upon adjacent property to determine whether "it will cause such damage to the character of the neighborhood as to constitute 'substantial detriment to the public good[,]' " *Coventry,* 138 N.J. at 299, 650 A.2d 340 (*quoting Medici v. BPR Co.,* 107 N.J. 1, 22 n. 12, 526 A.2d 109 (1987)), and on whether the variance "is reconcilable with

the municipality's legislative determination that the condition should be imposed on all conditional uses in that zoning district." *Id.*

 If, however, the conditional use is considered an inherently beneficial use, an applicant's burden of proof is eased for the positive criteria are presumptively satisfied and the negative criteria are evaluated under a four-part balancing test. *See Sica v. Board of Adjustment of the Township of Wall,* 127 N.J. 152, 165–66, 603 A.2d 30 (1992). Under a *Sica* evaluation, the Board must "identify the public interest at stake[,]" "identify the detrimental effect that will ensue from the grant of the variance[,]" consider any "reasonable conditions" on the use which can be implemented to reduce the detrimental effect of the use and, finally, weigh these factors to determine whether the grant of the variance "would cause a substantial detriment to the public good." *Sica,* 127 N.J. at 165–66, 603 A.2d 30.

The Board declined to find that plaintiffs' proposed use was inherently beneficial or that it was not,[6] opting instead to "analyze

---

**5.** An inherently beneficial use is usually a non-commercial use that serves the general welfare. *See Sica v. Board of Adjustment of the Township of Wall,* 127 N.J. 152, 159–60, 603 A.2d 30 (1992). However, numerous profit-making ventures have been deemed to be inherently beneficial including, among others, a head trauma center, *Id.,* a 120–bed long term nursing home, *Urban Farms, Inc. v. Borough of Franklin Lakes,* 179 N.J.Super. 203, 212, 431 A.2d 163 (App. Div.), *certif. denied,* 87 N.J. 428, 434 A.2d 1099 (1981), and a tertiary sewage treatment plant, *Wickatunk Village, Inc. v. Township of Marlboro,* 118 N.J.Super. 445, 452, 288 A.2d 308 (1972).

**6.** Numerous Law and Appellate Division decisions have recognized commercial mobile communications facilities to be inherently beneficial uses. *See, e.g., New Brunswick Cellular Tel. Co. v. Borough of South Plainfield Board of Adjustment,* 305 N.J.Super. 151, 166, 701 A.2d 1281 (App.Div.1997); *Nynex Mobile Communications Co. v. Hazlet Township Zoning Board of Adjustment,* 276 N.J.Super. 598, 609, 648 A.2d 724 (App.Div.1994); *New Brunswick Cellular Tel. Co. v. Township of Edison Zoning Board of Adjustment,* 300 N.J.Super. 456, 469–71, 693 A.2d 180 (Law Div.1997); *Kingwood Township Volunteer Fire Co. v. Board of Adjustment,* 272 N.J.Super. 498, 503–06, 640 A.2d 356 (Law Div.1993). Despite this seemingly universal recognition, the Board found that the proposed cellular mon-

opole should not be "automatically" entitled to inherently beneficial status. Resolution at 23. Instead of looking just to the particular use, the Board reasoned, it is necessary to consider how that use would affect the general welfare and public good. *Id.* Concluding that the cellular service currently being provided to the area was "of sufficient quality" but would unquestionably be improved with the construction of the monopole, the Board found that "a determination that the proposed monopole is, or is not, 'inherently beneficial' is not determinative." *Id.* at 25.

This court need not belabor the Board's discussion of the inherently beneficial status of the proposed use because, despite its extensive preliminary discussion, the Board proceeded to evaluate the application under the tests for both inherently beneficial and non-inherently beneficial uses, denying the application under either test. Moreover, plaintiffs do not say why the proposed use should be considered inherently beneficial and, instead, conclusorily—and erroneously—state that the Board so found. Pl.Mem. in Supp. of Mot. for Summ.J. at 10. Finally, it bears mention that approximately six months after the Board issued its Resolution, the Supreme Court of New Jersey declined to declare mobile communications facilities that require construction of towers or monopoles—such as the one proposed in this case—to necessarily be inherently beneficial uses. *See Smart SMR of New York, Inc. v. Borough of Fair Lawn Board of*

the application from two perspectives, one as if the use were 'inherently beneficial,' and the other as if it were not." Resolution at 25. Either way, the Board found the application wanting and denied the conditional use variance.

Assuming, of course, that the TCA did not displace state zoning law, the parties do not dispute that the Board applied the correct tests under New Jersey law. The issue, instead, is whether the Board adequately evaluated the documentary and testimonial evidence and based its decision upon substantial evidence. After reviewing the Resolution and the evidence supplied by the parties, this court concludes that the Board's decision to deny plaintiffs' application for a conditional use variance—under both the test for a non-inherently beneficial use and the test for an inherently beneficial use—was supported by substantial evidence. The court will take each in turn.

### 1. *Non–Inherently Beneficial Use*

The Board's finding that plaintiffs' proposed use did not meet either the positive or negative criteria for a non-inherently beneficial conditional use was based upon substantial evidence.

■ The positive criteria for a conditional use variance are satisfied if the applicant can establish that the proposed site is appropriate for the use notwithstanding deviation from the conditions set forth in the relevant zoning ordinance. *Coventry*, 138 N.J. at 298, 650 A.2d 340. Section 85–44 of the Zoning Ordinance of the Borough states that public utility uses must comply with lot size, yard and height setback requirements, that adequate parking exist, and that the use be in a location that "is necessary and essential for the efficiency of the public utility system...." Focussing mainly on the lot size

and setback requirements, the Board found that the "site is simply too small, and is not appropriate," a finding supported by the "sheer number" of variances required. Resolution at 9.

The Board pointed to section 85–34 of the Zoning Ordinance which limits radio and television towers and antennas to 50 feet and requires that the distance between the structure and the adjacent property line be equal to or greater than the height of the structure. Not only did the proposed 127–foot monopole well exceed the 50–foot height requirement, but the site, which has an area of only 2350 square feet, was too small to provide the 127–foot radius between the monopole and the lot lines required by the Ordinance. Indeed, the distances between the proposed monopole and the westerly and northerly lot lines were only 4.25 feet and 26.42 feet, respectively, considerably less than the 127 feet required. *See* Variance Summary, Exh. 1 to Resolution.

The Board further noted the expert testimony of Malcolm Kasler, a community planning consultant, who testified, among other things, that the setback and height requirements—creating what he called a "fall down" zone—ensured that if a structure were to fall, it would fall upon its own lot and not damage adjoining property. June 6, 1996 Hearing at 41–42. The Board did not disagree with Mr. Kasler but pointed to the "substantial, unrebutted" testimony of the structural integrity of the tower.[7] Resolution at 29. Even given the structural integrity of the tower, however, the Board reasoned that the "buffer zone" mandated by section 85–34 would minimize the adverse visual impact created by placing an extremely oversized structure on a "tiny" lot.[8] This conclusion was based upon substantial evidence.

*Adjustment*, 152 N.J. 309, 331, 704 A.2d 1271 (1998).

7. For example, plaintiffs' witness Jeffrey Kirby, a civil engineer, testified to the structural safety of the proposed monopole, noting that "there is no documented case of any structure of this type collapsing or creating any substantial structural hazard due to natural occurrences." May 4, 1995 Hearing at 123.

8. While the Board also had "concerns about the ability of the tower to support the triple antenna array located at its top," and reasoned that the buffer zone was necessary to protect the public in the event that the antennas or other equipment attached to the monopole were to fall, the record contains uncontroverted testimony by Mr. Kirby that he "is not aware of any cases where after construction has been completed and the site is operational that there has been any occur-

■ Aside from safety concerns, the purpose of setback requirements is to regulate the intensity of land use and accommodate aesthetic concerns. *Damurjian v. Board of Adjustment of the Township of Colts Neck*, 299 N.J.Super. 84, 93, 690 A.2d 655 (App.Div. 1997) (observing that, in zoning, "aesthetic qualities are best maintained through the use ... of lot size, setbacks, side yards, lot coverage ratios, topographical and landscaping requirements") (*quoting Home Builders League of South Jersey, Inc. v. Berlin Township*, 81 N.J. 127, 145–46, 405 A.2d 381 (1979)). The Board correctly noted that there would be "virtually no vacant space around the base of the monopole." Resolution at 30. Moreover, because of the size and shape of the site, the proposed structures and buildings would violate almost every bulk variance requirement of the R–2 zone. *Id.* In addition, as the Board pointed out, the monopole is "extremely close" to a number of Borough facilities used by members of the public and a heavily traveled railroad line. *Id.* "The level of the activity in the area, both residential and commercial, makes the further intensification of the use, through the construction of a structure of considerable mass in a confined area, inappropriate." *Id.* at 9.

■ This is not to say that simply because the monopole would violate height, setback and bulk requirements it would necessarily be inappropriate for the proposed site. Indeed, the positive criteria inquiry for a conditional use variance is whether the site is inappropriate *"notwithstanding* the deviations from one or more conditions imposed by the ordinance." *Coventry*, 138 N.J. at 298, 650 A.2d 340 (emphasis added). Here, however, the proposed use would not minimally violate the height and setback requirements but would be almost three times the maximum permitted height and would virtually abut the property line. Such substantial deviations, as well as the number of bulk variances required to fit the monopole into a very "confined space," Resolution at 30, support the Board's findings that a larger buffer zone is needed not only to protect the public but primarily to minimize the adverse visual

rences of an antenna coming loose and falling

impact of such a crowded site. Thus, substantial evidence supports the Board's conclusion that the site is too small and is, therefore, inappropriate for the proposed monopole.

With reference to the negative criteria, the Board concluded that the proposed use would cause "such damage to the character of the neighborhood as to constitute 'substantial detriment to the public good.'" *Coventry*, 138 N.J. at 299, 650 A.2d 340 (citations omitted). Specifically, the Board found that the construction of the monopole would have a substantially detrimental effect on the surrounding properties primarily because of its adverse visual impact and its effect on real estate values.

■ Again, substantial evidence supports this conclusion. Taking visual impact first, the Board noted that, at 127 feet, the monopole would be the tallest structure within the Borough of Ho–Ho–Kus and would "tower over the adjoining residential areas." Resolution at 17. Moreover, the monopole would be substantially taller than the existing tree line which is estimated to be seventy feet high. *Id.; see also* March 9, 1995 Hearing at 81. Furthermore, because vegetation is primarily deciduous in the area, the monopole and accompanying antennas would be even more visible for a significant portion of the year. Finally, as distinguished from many of the cases cited by plaintiffs, the monopole would not be attached to an existing structure, but would be freestanding. Such a structure, especially when built so close to the property lines, would add to the imposing nature of the facility. *Cf. Smart SMR of New York v. Borough of Fair Lawn Board of Adjustment*, 152 N.J. 309, 331, 704 A.2d 1271 (1998) (noting that cellular communication facilities that require the construction of a tower or monopole may pose special land use problems as opposed to those that simply involve attaching antennas to an existing structure).

Plaintiffs argue that the Board failed to consider the testimony of Susan Gruel, a licensed professional planner, who testified that the proposed use would have no impact

off." May 4, 1995 Hearing at 165–66.

on the adjoining residential areas. Ms. Gruel opined that the surrounding neighborhood is a "mixed-use" neighborhood, consisting of residences as well as a recycling facility, a salt barn, an industrial park, and an operating railroad with approximately fifty-eight trains passing each day. January 18, 1996 Hearing at 41, 43, 44. In addition, Ms. Gruel took numerous photographs of the proposed site at times when a crane had been constructed to simulate the monopole ("crane test"), and concluded that the visual impact of the monopole would be "de minimis." *Id.* at 62–63.

The Board did, in fact, consider Ms. Gruel's testimony but disagreed with her conclusions. Concluding instead that the neighborhood was "primarily residential in nature," the Board noted that the site is surrounded by residential areas in both Ho–Ho–Kus and Ridgewood and the nearby public and commercial uses are confined to a relatively small area. Resolution at 18. In addition to the fact that the site is zoned for residential uses, the closest residence is only 285 feet from the proposed monopole, with the next closest at 290 feet. January 18, 1996 Hearing at 67. Indeed, Mr. Kasler testified that 87 homes are located within 1000 feet of the monopole and 23 within 500 feet, the Borough was residential in nature and the Master Plan intended that it continue to be so, and the monopole would be inconsistent with the surrounding residential area. June 6, 1996 Hearing at 34, 56, 67–68, 77, 81–82, 104.

The Board also rejected Ms. Gruel's photographs because not one was taken from the backyards or windows of any of the residences. Resolution at 16; *see also* January 18, 1996 Hearing at 82–83. The Board, instead, found persuasive the testimony and photographs of William Hamilton, a licensed planner and landscape architect in New Jersey, who viewed the site from the backyards of the surrounding residences, took photographs during the second crane test, and testified that twenty-three homes would be visually impacted to some extent by the monopole. Resolution at 14–15; *see also* April 11, 1996 Hearing at 107. Although plaintiffs take issue with Mr. Hamilton's testimony because he is a resident of Ho–Ho–Kus and,

thus, allegedly biased, the Board made it clear that it was relying not so much on Mr. Hamilton's opinion, but on the facts he adduced and exhibits that he presented to the Board. Resolution at 14. Parenthetically, Ms. Gruel admitted later in her testimony that if residents could see the monopole from their windows, it "would be a factor" she would consider in determining the adverse visual impact. Feb. 1, 1996 Hearing at 39. The Board's finding that the monopole would have a "substantial detrimental visual impact upon residential properties" of the area, *id.* at 16, is supported by substantial evidence. *See Century Cellunet*, 993 F.Supp. at 1077 (considering the harmony of proposed cellular tower with existing neighborhood or residences that will view it in evaluating substantial evidence for local planning commission's denial); *AT & T Wireless Services of Florida*, 994 F.Supp. at 1430 ("It is within the prerogatives of a local government to determine that a tower (or steeple) is too imposing for a particular neighborhood.").

Finally, plaintiffs' sweeping argument that "aesthetic concerns" such as visual impact cannot be considered, Pl.Mem. in Supp. of Mot. for Summ.J. at 26, is belied by their own expert, Ms. Gruel, who acknowledged that visual impact is considered in evaluating the negative criteria for a variance application and provided extensive testimony to that end. January 18, 1996 Hearing at 40. Furthermore, the TCA's legislative history leaves little doubt that local boards can treat cellular communications facilities differently if they "create different visual aesthetic, or safety concerns ... to the extent permitted under generally applicable zoning requirements." H.R.Conf.Rep. No. 104–458, at 445–48 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 222. Under New Jersey land use law, height and visibility of a structure are reasonable considerations. In refusing to find cellular service facilities that require construction of a tower or monopole to be inherently beneficial, *see* note 6, *supra*, the Supreme Court of New Jersey recently noted that an important consideration was the fact that the "towers and monopoles are often vastly higher than other structures in the municipality, particularly those in residential

zones." *Smart SMR of New York*, 152 N.J. at 331, 704 A.2d 1271.

More importantly, however, with reference to the negative criteria of the *Coventry* test, the Board found that the real estate values of neighboring residences would be adversely affected by the erection of the proposed monopole. *See Smart SMR of New York*, 152 N.J. at 334, 704 A.2d 1271 (considering effect of cellular tower on property values in evaluating the negative criteria). The Board was presented with the testimony of many witnesses concerning property values and concluded that the testimony of Edward Kerwin, a tax assessor, was most persuasive. Mr. Kerwin performed a detailed paired sales analysis by selecting property near external structures such as water towers, power lines or cellular towers, and property which was not, adjusting for any other differences in the pair of properties, and comparing the two types of property in order to measure the effect of the structure on real estate values. Based on this study, Mr. Kerwin concluded that cellular towers cause a significant reduction in the value of property near those towers. August 1, 1996 Hearing at 60. As for the Ho-Ho-Kus site, Mr. Kerwin opined that the properties near the site would suffer a "negative impact" from the monopole resulting in a total loss of over $660,000 for the properties involved. *Id.* at 80-82.

To rebut Mr. Kerwin's testimony, plaintiffs called John Brody, a real estate appraiser, who challenged some of the minor adjustments made by Mr. Kerwin, such as subtracting $1,000 for a hot tub instead of the $8,000 figure Mr. Brody suggested was accurate. Nov. 7, 1996 Hearing at 30. The Board evaluated the testimony of both experts and determined that, despite differences of opinion as to the precise value of hot tubs or finished basements, it was convinced by the thrust of Mr. Kerwin's expert testimony, namely, that construction of the monopole would create a substantial adverse effect on property values.

Furthermore, the Board considered the testimony of plaintiffs' real estate appraisers, Robert Vance and Thomas Welsh, and rejected it because they presented studies of properties in communities substantially different from Ho-Ho-Kus—as even Mr. Brody acknowledged, November 7, 1996 Hearing at 82-83, 99—and because they did not perform a paired-sales analysis. Finally, given the extensive testimony of Mr. Kerwin, with the "thrust" of that testimony being that "the monopole will have a significantly detrimental impact upon real estate values," Resolution at 26, it was eminently reasonable for the Board to find it incredible that all of plaintiffs' real estate witnesses testified that the proposed monopole would have "no discernible impact on the value of properties in the surrounding area." *Id.*

This is not to say that Mr. Kerwin was, in fact, correct in concluding that the monopole would have an adverse effect on real estate values, or that Mr. Brody was incorrect when he concluded that the monopole would not have even a one percent effect. *See* October 17, 1996 Hearing at 130; Nov. 21, 1996 Hearing at 33. This court simply recognizes that when faced with competing experts, the Board must make difficult decisions—and did so here, after observing and questioning the witnesses and examining all of the exhibits and studies. As the District Court for the Middle District of Florida aptly stated, "[i]t is not for this Court to reweigh that decision, or substitute the decision of the Court for that made by the Board; the only task before the Court is to determine whether there was enough evidence before the Board to support the decision it made." *AT & T Wireless Services of Florida*, 994 F.Supp. at 1430. The expert testimony of Mr. Kerwin established that there would be a decline in property values from the construction of the monopole, and the Board was well within its rights to accept that conclusion.

### 2. *Inherently Beneficial Use*

Even if the Board had considered the proposed cellular service facility to be an inherently beneficial use—thereby presumptively satisfying the positive criteria—there was substantial evidence enabling the Board to conclude that plaintiffs could not satisfy the negative criteria under the *Sica* balancing test. Under *Sica*, the negative criteria are evaluated by balancing the public interest at stake, the detrimental effect of the variance,

and any reasonable conditions that could minimize the detrimental effect, in order to determine if the variance would cause "substantial detriment to the public good." *Sica*, 127 N.J. at 165–66, 603 A.2d 30.

The Board determined that the public interest to be served by the monopole was not "compelling" because there was cellular telephone service in the area and the quality of that service was adequate, although the monopole would improve service. Resolution at 33. Plaintiffs disagree with the Board's conclusion and argue that the Board too quickly disregarded plaintiffs' expert testimony which established that there are gaps in service for both AT & T Wireless and BANM cellular service. Mark Brodsky, the radio frequency engineer for Cellular One® (now known as AT & T Wireless), testified that although there is always a "chance" that a call might go through, March 9, 1995 Hearing at 126, three areas were deemed "no service" areas and the business district has poor coverage. *Id.* at 125–26, 129–31, 140–41.[9] Similarly, the radio frequency engineer for BANM, Glen Pierson, deemed BANM's cellular service in the area to be "unreliable" and of "poor, unacceptable quality." April 13, 1995 Hearing at 109–10. Finally, David Mendes, the engineer for Nextel, testified that coverage within the Borough under the Nextel system for enhanced specialized mobile radio service is "almost nonexistent." April 13, 1995 Hearing at 169.

Instead of accepting this expert testimony, plaintiffs argue, the Board impermissibly looked to the testimony of two local residents, Scott Johnson and Ernest Butler, who recorded twelve cellular phone calls made within the Borough to Mr. Johnson's wife (the "Johnson/Butler test"). Plaintiffs also point out that the Johnson/Butler test was discredited by Mr. Brodsky who testified that the sample size was too small, only a few calls were made from the worst coverage

areas, the callers were stationary when the calls were made, the calls were made on a Saturday, a non-commuter day, and the test was performed at a time of year when there were no leaves on the trees to interfere with the signals. December 5, 1996 Hearing at 16, 17, 20, 23.

This court agrees that the Johnson/Butler test, essentially non-expert testimony presented by local residents with possible biases, is not enough to discredit the testimony of qualified experts. While the Board is certainly entitled to decide that it will disregard specific evidence, "an agency board or commission consisting of lay persons may not completely disregard the only expert testimony available on an issue." *Sprint Spectrum L.P. v. Town of Farmington*, 1997 WL 631104 at *4 (D.Conn. Oct.6, 1997) (citation omitted).

That having been said, however, the record as a whole supports the Board's conclusion that adequate wireless service is presently available in Ho–Ho–Kus. Apart from the Johnson/Butler test and the numerous residents who testified that they use their cellular phones throughout Ho–Ho–Kus, plaintiffs' expert witnesses testified—at best—only that there are some gaps in service within the Borough, not that service is unavailable. In addition, the Johnson/Butler test, with its flaws and lack of sophistication, provided the only recorded examples of cellular telephone calls placed within the area to be served by the monopole. After listening to those calls, the Board noted that they were "clearly audible" with "minimal static." Resolution at 13.

In light of the fact that wireless service is generally available in the area, perhaps with some gaps and most likely with some static, and the fact that the FCC does not mandate optimal service but only substantially better than mediocre service,[10] considerable weight was given to the detrimental effect of grant-

---

**9.** As the Board noted, Mr. Brodsky could not state that there were, in fact, any areas of "no service" in Ho–Ho–Kus and could only identify three areas where the chances of getting the "no service" light are "very high." Resolution at 12.

**10.** Plaintiffs' experts testified that the monopole was necessary to meet their goal of providing

"land-line quality" service. March 23, 1995 Hearing at 154. However, under FCC regulations, in order for a licensed wireless provider to renew its license, it need only provide "sound, favorable, and substantially above a level of mediocre service...." *See* 47 C.F.R. § 22.940 (1997).

ing the conditional use variance. As was previously discussed, the Board concluded—with ample support—that allowing the variance would result in a substantial detriment to the surrounding area due to adverse visual impact and a reduction in property values. Furthermore, no reasonable conditions could be imposed to minimize the detriment because the monopole must be higher than the tree-line in order to be effective and the property is so small that bulk setback variances cannot be avoided by altering the proposed placement. Therefore, under the *Sica* balancing test, substantial evidence supports the Board's conclusion that the application did not satisfy the negative criteria.

This is not that close a case. Had the Board found some necessity for providing *seamless* wireless service and found the decrease in property values and adverse visual impact to be less compelling, perhaps the balance would have tipped in favor of allowing the variance. Even where the balance is close, however, "the Board is in the better position to weigh the positive and negative criteria and make the determination as to whether on balance the grant of the variance can be made without substantial detriment." *New Brunswick Cellular Telephone Co. v. Borough of South Plainfield Board of Adjustment*, 305 N.J.Super. 151, 171, 701 A.2d 1281 (App.Div.1997); *see also Sprint Spectrum L.P. v. Town of North Stonington*, 12 F.Supp.2d 247, 252 (D.Conn.1998) (under the TCA, "[a] district court generally defers to a zoning board's decision and it cannot substitute its judgment for that of the board").

 Were courts to hold that merely because there are some gaps in wireless service in an area (or even if service is basically unavailable as in the case of Nextel), the public interest *necessarily* tips the balance in favor of allowing a variance, local boards would be obliged to approve virtually every application which would improve service, without regard to its impact on the surrounding areas. That simply cannot be the case. Such a result would vitiate state land use law and render irrelevant the factors considered in a variance application. As long as the Board's decision was not an attempt to prohibit personal wireless service altogether, to discriminate among providers, or to impermissibly base its denial upon the environmental effects of radio frequency emissions, local land use law is controlling. *See AT & T Wireless Services of Florida v. Orange County*, 982 F.Supp. 856, 861 (M.D.Fla.1997). As the TCA's legislative history makes clear, albeit in the context of unreasonable discrimination, "the conferees do not intend that if a State or local government grants a permit in a commercial district, it must also grant a permit . . . in a residential area." H.R.Conf. Rep. No. 104–458, at 445–48 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 222. In sum, substantial evidence supports the Board's conclusion that the detriment from granting the variance outweighs the public's interest in improved service.

One last point. Plaintiffs invoke numerous cases in which a lack of substantial evidence was found. In those cases, however, the local zoning authority simply summarily denied the application of a cellular provider without a written decision explaining the basis for the denial. *See, e.g., Illinois RSA No. 3, Inc. v. County of Peoria*, 963 F.Supp. 732 (C.D.Ill.1997) (written denial consisted of a two paragraph letter stating that the request for a special use permit is denied and informing the party of its right to appeal); *Western PCS II Corp. v. Extraterritorial Zoning Authority of the City and County of Santa Fe*, 957 F.Supp. 1230 (D.N.M.1997) (zoning authority issued no written decision in support of its denial); *but see AT & T Wireless PCS*, 155 F.3d 423, 429 (reversing district court and holding that the condensed minutes of the meeting and a letter with the word "Denied" rubber stamped on the bottom was sufficient to satisfy writing requirement). *See also BellSouth Mobility v. Gwinnett County, Georgia*, 944 F.Supp. 923, 928 (N.D.Ga.1996) (five minutes of testimony of one resident's "generalized concerns" does not constitute substantial evidence in light of the compelling evidence supporting the application). In contrast, here, the Board conducted lengthy hearings and issued a comprehensive and balanced 36–page Resolution in which the correct legal standards were employed and the reasons for the denial explained in detail. The Board's decision simply does not fall within the category of denials prohibited by

the TCA, namely "unreasoned denials that make only vague references to applicable legal standards." *AT & T Wireless Services of Florida*, 982 F.Supp. at 860.

For the reasons discussed above, irrespective of whether the proposed use is treated as inherently beneficial or not, the Board's denial of the application was supported by substantial evidence.

### 3. *Decision Did Not Unreasonably Discriminate Against Providers of Functionally Equivalent Wireless Service*

■ Plaintiffs argue next that the Board's decision violated the TCA by "unreasonably discriminat[ing] among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i)(I). Again, this court does not agree.

First, there is no evidence that the Board's decision favored one carrier over another or that the decision protected current providers of wireless service within the Borough from competition. The denial of the variance equally affected all three companies licensed to supply wireless service to the Borough. *See AT & T Wireless PCS*, 155 F.3d 423, 426 (finding argument that city council "discriminated" when it denied application involving all four companies that offer wireless service to the area to be "dubious at best").

Moreover, even if some sort of unequal treatment could be discerned, the unequal treatment must be unreasonable. *See Sprint Spectrum L.P. v. Jefferson County*, 968 F.Supp. 1457, 1467 (N.D.Ala.1997) (noting that the TCA is not violated simply by unequal treatment but only by "unreasonable" discrimination). A zoning authority will not be found to have acted unreasonably if it had a "legitimate basis" for its decision. *See id.* 968 F.Supp. at 1468; *Smart SMR of New York, Inc. v. Zoning Commission of the Town of Stratford*, 995 F.Supp. 52, 59 (D.Conn.1998). Here, the Board correctly applied the legal standards enunciated by the Municipal Land Use Law, N.J.S.A. 40:55D-1, *et seq.*, and relevant judicial interpretations. It then denied the conditional use variance primarily because of the proposed monopole's adverse visual impact and reduction in surrounding property values. Legislative history of the TCA states that the Act was intended to "provide localities with the flexibility to treat facilities that create different visual, aesthetic or safety concerns differently to the extent permitted under generally applicable zoning requirements...." H.R.Conf.Rep. No. 104-458, at 445-48 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124, 222. The Board's rationale for the denial of plaintiffs' application was unquestionably legitimate and there was no violation of 47 U.S.C. § 332(c)(7)(B)(i)(I).

### 4. *Decision Did Not Have the Effect of Prohibiting Personal Wireless Service*

■ Finally, plaintiffs assert that the Board's decision violated 47 U.S.C. § 332(c)(7)(i)(II), which provides that local zoning authorities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." Yet, again, this court does not agree.

In the strictest interpretation of this provision to date, the Court of Appeals for the Fourth Circuit recently held that subsection (B)(i)(II) applies only "to 'blanket prohibitions' and 'general bans or policies,' *not to individual zoning decisions*." *AT & T Wireless PCS*, 155 F.3d 423, 428 (4th Cir.1998) (emphasis added). Other courts, however, have applied subsection (B)(i)(II) to individual zoning decisions and have held that the general ban or policy need not be in the form of an explicit moratorium or bar, but may be found in facially neutral policies which serve as a pretense for arbitrary decisionmaking or would necessarily result in the denial of any or all applications in the area to be served. *Virginia Metronet*, 984 F.Supp. at 971.

Under either interpretation, however, the Board's decision did not violate subsection (B)(i)(II) of the TCA. The decision in question was surely not a moratorium or blanket prohibition, but was an individual zoning decision. Moreover, while the Board's decision certainly prohibited the construction of the proposed monopole on the leased premises, there is no indication in the record that the Board was hostile to other or all wireless

facilities being constructed within the Borough, and its decision was not based on the testimony of the public concerning its fears of radio frequency emissions, Resolution at 27, 35, or on a "headcount" of persons opposing the application. Resolution at 35.

As one court has stated, "Congress did not obviate the need to comply with local government requirements, as long as the requirements do not serve to ban towers entirely." *AT & T Wireless Services of Florida*, 994 F.Supp. at 1429. Nothing before this court indicates that an application brought under different circumstances—such as placement of a monopole on a larger lot, in a different area within the Borough, or antennas appended to an existing structure—would suffer the same fate.[11]

### III. *Conclusion*

Having found that defendant has not violated any of the provisions of the TCA, this court will grant defendant's motion for summary judgment as to Count I and will, accordingly, deny plaintiffs' motion.

Count II is all that remains of the complaint. Described as a "New Jersey State Law claim," Count II alleges that the decision of the Board in denying plaintiffs' application was "arbitrary, unreasonable, capricious, contrary to the record below and the applicable law, constitutes an abuse of discretion contrary to the N.J.S.A. 40:50D–1 *et seq.* and cannot be sustained under any interpretation of the facts or law in this matter." Comp. ¶ 98. Each of the reasons stated in ¶ 99 as support for this conclusion has been disposed of in this opinion under a tougher standard of review and, of course, under the same substantive New Jersey law applicable to Count II. Therefore, on the court's own motion, Count II will be dismissed.

---

**11.** Parenthetically, this court is unmoved by the argument that the Board's decision has the effect of prohibiting personal wireless service because the Board denied the variance to build on the only site which met plaintiffs' three criteria for placement of the monopole. *See* March 9, 1995 Hearing at 107–08 (testimony of Mr. Brodsky that the proposed site was the only one which would meet the radio frequency needs, was available for lease or purchase, and could meet construction needs). Simply because the proposed site was the only site available for lease or purchase at that time does not mean that the Board was obliged to grant the conditional use variance or risk running afoul of the TCA.