650 A.2d 340

COVENTRY SQUARE, INC., PLAINTIFF–APPELLANT, v. WEST-
WOOD ZONING BOARD OF ADJUSTMENT, DEFENDANT–RE-
SPONDENT, AND WESTWOOD DEVELOPMENT ASSOCIATES,
DEFENDANT.

Argued October 11, 1994—Decided December 15, 1994.

*Richard J. Allen, Jr.,* argued the cause for appellant.

*Irving C. Evers* argued the cause for respondent.

The opinion of the Court was delivered by

GARIBALDI, J.

In this appeal, we establish the standards for granting a variance for a "deviation from a specification or standard * * * pertaining solely to a conditional use" under *N.J.S.A.* 40:55D–70d(3), of the Municipal Land Use Law (MLUL), *N.J.S.A.* 40:55D–1 to –133. In so doing, we discuss the criteria an applicant must demonstrate to receive an *N.J.S.A.* 40:55D–70d(3) variance. Those standards reflect the fact that a conditional use is neither prohibited throughout the zone nor permitted at every location in the zone: rather, it is permitted at those locations in the zone where the use meets the conditions set forth in the zoning ordinance. *N.J.S.A.* 40:55D–67. Because a conditional use is not a prohibited use, we hold that it need not meet the stringent special reasons standards for a commercial-use variance that we summarized in *Medici v. BPR Co.,* 107 *N.J.* 1, 9–18, 526 *A.*2d 109 (1987).

We therefore distinguish between two types of variances: one is a use variance; the other is a variance for a deviation from a condition the ordinance places on a use in a given zone. They are both "special reasons" variances under *N.J.S.A.* 40:55D–70d, but their focus is different. A use variance allows the applicant to engage in a prohibited use: It is the use that violates the ordinance. A variance for a deviation from a condition allows the applicant to engage in a conditional use despite the applicant's failure to meet one or more of the conditions: It is not the use but the non-compliance with the conditions that violates the ordinance.

## I

The applicant, Westwood Development Associates (Associates), planned to build an apartment complex in a zone in which apartments were a conditional use. (Associates defaulted and did not appear in the proceedings.) Because Associates' plan deviated from conditions imposing a minimum rear-yard setback and a minimum aggregate-side-yard setback, Associates applied to defendant Westwood Zoning Board of Adjustment (the Board) for a variance from those conditions.

Associates owns an 8.7–acre tract on Old Hook Road, Westwood, Bergen County. The lot is basically rectangular, with a depth of approximately 800 feet and a width of about 500 feet. The southerly lot line fronts on Old Hook Road, a four-lane, two-way county road. A cemetery is opposite the lot. Directly east of the cemetery on Old Hook Road is the apartment complex of plaintiff, Coventry Square.

The rear, northerly lot line of Associates' property abuts Pascack Road, across from which are single-family residences. East of the lot is a Red and Tan Bus Garage (a pre-existing, non-conforming use); east of the garage is Pascack Valley Hospital. The property's westerly lot line abuts the rear yards of single-family residences fronting on Sand Road, a street that extends north from Old Hook Road to Pascack Road. There are currently pre-existing, non-conforming uses on Associates' lot: a laundromat, a dry cleaner, and a tank from which the public may purchase propane gas.

At the time Associates made its application to build an eighteen-building, 216–unit apartment complex, its property was located in the O3 zone, in which the permitted uses are office buildings, medical laboratories, and research facilities. Conditional uses in the O3 zone include certain schools, hospitals, sports facilities, and apartments that comply with the specifications of the AP zone. The AP zone, primarily a residential zone, allows single family dwellings, essential municipal uses, churches, home occupations, professional offices occupying up to fifty percent of the first floor

of residences, and apartments for three or more families. The bulk specifications of the AP zone are: minimum lot area of 15,000 square feet; minimum lot frontage of 150 feet; minimum lot depth of 100 feet; minimum side yards of twenty feet each, with an aggregate side yard of thirty percent of lot width; front-yard setback of twenty feet; rear yard of forty percent of lot depth; maximum building height of three stories and of thirty-five feet; and maximum building coverage of thirty percent of the lot. The AP zone also requires a minimum green area of thirty-five percent of the lot area, and ten-foot buffers on the side and rear of the lot where it abuts a residential zone. The ordinance does not specify a maximum unit-per-acre density for the AP zone; however, the minimum setbacks and maximum building-coverage specifications presumably serve to prevent excessive density.

The apartment complex that Associates proposed to build would meet all but two of the bulk specifications of the AP zone. Specifically, the plan deviates from the rear-yard and the aggregate side-yard setback requirements. The aggregate side-yard setback requirement is thirty percent of frontage, which would be almost 150 feet. Associates' plan has side yards of thirty-three feet each, for an aggregate of sixty-six feet. The rear-yard setback minimum is forty percent of lot depth, which would require a rear-yard setback of over 300 feet. The plan has a rear-yard setback of seventy-five feet.

Associates' development also does not comply with two design standards of Article IX of the zoning ordinance regarding parking. That section of the ordinance requires thirty-foot roadbeds where there is two-way traffic with parking perpendicular to the roadway, § 65C–86E, and prohibits parking off a "main drive," § 65C–86B. Associates proposed twenty-five-foot roadbeds accommodating two-way traffic with perpendicular parking, as well as parking off its main drive.

Because of those deviations, Associates requested design waivers for the deviations from parking standards, and a variance from the rear-yard and aggregate-side-yard setback requirements. At

the four public hearings held on the application, Associates' witnesses included its architect, planner, engineer, traffic consultant, real estate appraiser, and landscaping and lighting architect. An attorney for an owner of a house on Sand Road appeared at the hearings to oppose the project. Plaintiff did not appear at any of the hearings.

Associates' witnesses explained the reasons for the plan's deviation from the rear- and aggregate-side-yard setback requirements. First, they explained that the lot is so deep that a forty-percent-of-depth rear-yard minimum would require a rear-yard setback the length of a football field. Second, they noted that the plan places all parking in the interior of the project. If parking were on the perimeter, the side-yard and rear-yard setbacks would be measured from the lot lines to the beginning of the dwellings, and the setbacks would include the parking mews. The experts explained that, by placing the parking within the complex and the dwelling units closer to the perimeter, Associates reduced the yard measurements but also provided a landscaped, more aesthetic buffer for the neighboring residents than would exterior parking. Moreover, they explained that because the rear and side yards are entirely landscaped, the plan would readily comply with the ten-foot buffer requirements on the north and west sides of the lot, which abut residential zones. Third, the experts noted that the plan's side-yard design is much less intrusive to the Sand Road neighbors than the ordinance mandates. The ordinance requires side yards of at least twenty feet each, and aggregate side yards of at least thirty percent of the frontage. The witnesses observed that if a side yard abuts residences, the ten-foot-buffer requirement prohibits parking within the ten feet of the side yard closest to the residences.

Hence, they noted that a plan that meets all the ordinances' conditions could have aggregate side yards of 150 feet, with a 130-foot easterly side yard abutting the bus garage, and merely a twenty-foot westerly side yard abutting the residences on Sand Road. Within that twenty-foot side yard, a complying plan could

have parking ten feet from the lot line, so that the neighboring single-family residences would have cars from the complex as close as ten feet from their property lines. Associates' plan provides a thirty-three-foot landscaped buffer on each side, with no parking in the buffer.

Associates' witnesses also emphasized that the density of Associates' proposed complex is relatively low. Associates' proposal would have a density of 24.8 units per acre; the range of density for nearby complexes is 24.6 to 30.93 units per acre. The Coventry Square complex has a density of 30.93 units per acre. Moreover, because the complex would have landscaped area on forty-six percent of the lot, it more than meets the AP minimum of thirty-five percent landscaped area.

Additionally, the witnesses testified that the site was well suited for apartments, which would serve as an appropriate transitional use between the single-family residences to the north and west of the lot and the more industrial uses to its south and east. They also observed that the complex would be less intrusive to the residences than a fully complying office building would be.

The Board adopted a resolution granting the variances and the design waivers, and made fact-findings in support of the statutory special reasons standard:

(a) that the granting of the variance would eliminate a pre-existing non-conforming use and would replace the use with one more in keeping with the Zone Plan;

(b) that multi-family housing would provide an appropriate transitional use between the residential section and non-residential areas;

(c) that the variances sought by the applicant relative to side-yard and rear-yard requirements would permit a more pleasing development, farther away from the streets;

(d) that the proposed development would be less intrusive to the neighboring residential properties than would be a complying office project, which could occupy as much as 190,000 square feet;

(e) that to deny the request of the applicant for rear-yard variances would require the applicant to maintain rear yards in excess of 300 feet, a fact that the Board determined was unnecessary and entirely illogical;

(f) that to deny the applicants the request for side-yard variances would not permit the applicant to provide the adjacent residential area as much buffer area as proposed;

(g) that the proposed use would promote the general welfare because the site is particularly suitable for the use intended.

Coventry Square filed this action in lieu of prerogative writ challenging the validity of the Board's resolution, and contending that Associates' failure to comply with the conditional-use standards rendered its project a prohibited use within the zone. Conventry contended that Associates should have met the stringent standards for a commercial-use variance established in *Medici, supra,* 107 *N.J.* 1, 526 *A.2d* 109, and that Associates had failed to produce such proofs. Coventry Square also argued that the deviations from parking specifications also required variances, and that the Board had no authority to grant such variances based on the evidence presented.

The Law Division held that even a minor deviation from a condition "converted" a conditional use into a prohibited use, requiring Associates to satisfy the standards for a use variance. The court, however, determined that housing is an inherently beneficial use, which satisfies the "special reasons" standard for a use variance. The court also found that the Board's findings were sufficient to meet the negative criteria for a use variance.

The Appellate Division found that the apartment complex was not an "inherently beneficial" use, but nevertheless affirmed the Board's decision. Noting that the Board's determination should not be overturned unless it is arbitrary, unreasonable, or capricious, the Appellate Division stated that "the special reasons set forth by the Board support the grant of the variances." The Appellate Division also found that the record supported the Board's conclusion that the applicant had satisfied the negative criteria. We granted Coventry Square's petition for certification, 136 *N.J.* 30, 641 *A.2d* 1041 (1994), and now affirm the judgment of the Appellate Division, but for reasons different from those relied on by that court.

## II

Conditional uses were not authorized prior to the enactment of the MLUL, but the Municipal Planning Act, *N.J.S.A.* 40:55–39b

(repealed 1975), authorized special-exception uses, the predecessor to conditional uses. That statute authorized only the board of adjustment to approve special-exception uses, and the board retained considerable discretion in the exercise of its authority. *See Swimming River Golf & Country Club v. Borough of New Shrewsbury*, 30 *N.J.* 132, 135–36, 152 *A.2d* 135 (1959); *Saddle River Country Day Sch. v. Borough of Saddle River*, 51 *N.J.Super.* 589, 604, 144 *A.2d* 425 (App.Div.1958), *aff'd*, 29 *N.J.* 468, 150 *A.2d* 34 (1959).

Although special-exception uses were "neither non-conforming nor akin to a variance," *Tullo v. Township of Millburn*, 54 *N.J.Super.* 483, 491, 149 *A.2d* 620 (App.Div.1959), the Municipal Planning Act established both affirmative and negative criteria for granting special exception uses. The affirmative criteria required the board to determine only that the project complied with the ordinance's requirements for the special-exception use. *See Verona, Inc. v. Mayor of West Caldwell*, 49 *N.J.* 274, 284, 229 *A.2d* 651 (1967). Hence, "[t]he basic difference between a use which is a special exception and one which requires a variance is that the former is legislatively *permitted* in a zone subject to controls whereas the latter is legislatively *prohibited* but may be allowed for special reasons." *Id.* at 282, 229 *A.2d* 651.

The substance of the negative criteria were the same for special exceptions as for use variances: that the board of adjustment could not approve an application "unless such relief [could] be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance." *N.J.S.A.* 40:55–39 (repealed 1975). However, the level of proofs required to satisfy the negative criteria for a special-exception use was acknowledged to be less substantial than that required for a use variance because "the ordinance itself makes the proposed [special-exception] use permissive in the particular zone." *Tullo, supra*, 54 *N.J.Super.* at 497, 149 *A.2d* 620 (referring to the zoning plan and ordinance prong of the negative

criteria); *accord Verona, supra,* 49 *N.J.* at 283, 229 *A.*2d 651 (referring to both prongs of the negative criteria).

The MLUL defines a conditional use as

a use permitted in a particular zoning district only upon a showing that such use *in a specified location* will comply with the conditions and standards for the location or operation of such use as contained in the zoning ordinance, and upon the issuance of an authorization therefor by the planning board.

[*N.J.S.A.* 40:55D-3 (emphasis added).]

Hence, the MLUL shifted jurisdiction over fully complying conditional uses from the board of adjustment to the planning board, reflecting the MLUL's recognition that a fully complying conditional use is essentially equivalent to a permitted use.

██ Generally, a conditional use is "suitable to a zoning district but not to every location within that district." *Cardinal Properties v. Westwood,* 227 *N.J.Super.* 284, 287, 547 *A.*2d 316 (App.Div.1988); *see PRB Enters., Inc. v. South Brunswick Planning Bd.,* 105 *N.J.* 1, 8, 518 *A.*2d 1099 (1987); *Urban Farms, Inc. v. Borough of Franklin Lakes,* 179 *N.J.Super.* 203, 211, 431 *A.*2d 163 (App.Div.), *certif. denied,* 87 *N.J.* 428, 434 *A.*2d 1099 (1981); *Tullo, supra,* 54 *N.J.Super.* at 490–91, 149 *A.*2d 620; *Value Oil Co. v. Town of Irvington,* 152 *N.J.Super.* 354, 366, 377 *A.*2d 1225 (Law Div.1977), *aff'd,* 164 *N.J.Super.* 419, 396 *A.*2d 1149 (App.Div.1978), *certif. denied,* 79 *N.J.* 501, 401 *A.*2d 256 (1979); *Piscitelli v. Township Comm. of Scotch Plains,* 103 *N.J.Super.* 589, 595, 248 *A.*2d 274 (Law Div.1968). Conditional uses are "uses ordinarily requiring special standards relating to traffic patterns, street access, parking, and the like in order to assure their functional and physical compatibility with the district as a whole and their appropriate integration into the district." *Exxon Co., U.S.A. v. Township of Livingston,* 199 *N.J.Super.* 470, 477, 489 *A.*2d 1218 (App.Div.1985).

The Municipal Planning Act did not specifically authorize variances from special-exception-use standards. Case law under that Act, however, suggested that a variance from a special-exception-use standard "would amount to a use variance * * * which requires the existence of 'special reasons' as well as meeting the

negative criteria." *Harvard Enters., Inc. v. Board of Adjustment,* 56 *N.J.* 362, 370, 266 *A.*2d 588 (1970) (Hall, J., concurring).

As originally enacted in 1975, the MLUL apparently adopted the reasoning of Justice Hall's *Harvard Enterprises* concurrence. Although the MLUL did not then explicitly state that conditional-use variances were to be treated as use variances under subsection d, the MLUL authorized boards of adjustment to approve conditional uses whenever the proposed development required approval by the board of a variance under *N.J.S.A.* 40:55D–70(d). *L.* 1975, c. 291, § 63 (codified at *N.J.S.A.* 40:55D–76). In *Darrell v. Governing Body,* 82 *N.J.* 426, 413 *A.*2d 610 (1980), we expressly held that the MLUL empowered boards of adjustment to grant conditional-use variances.

Because the 1979 amendments to the MLUL, *L.* 1979, c. 216, created confusion over whether boards of adjustment or planning boards had jurisdiction over conditional-use variances, the Legislature amended the MLUL again in 1984. *L.* 1984, c. 20. That amendment clarified that only the board of adjustment could grant conditional-use variances, and then only under the standards of subsection d, which requires proof of special reasons. However, the MLUL does not definitively establish the quality of proof that would satisfy the special-reasons standard in respect of conditional-use variances.

The standard for proving "special reasons," or the affirmative criteria, has not been defined by statute, but subsequent judicial interpretations have "infus[ed] substantive meaning into the 'special reasons' standard * * *." *Medici, supra,* 107 *N.J.* at 11, 526 *A.*2d 109. "Because of the nature of the subject no precise formula is feasible and each case therefore must turn on its own circumstances." *Kohl v. Mayor of Fair Lawn,* 50 *N.J.* 268, 276, 234 *A.*2d 385 (1967).

In *Medici, supra,* we summarized the three circumstances that constitute special reasons for use variances:

if the use for which a variance is sought is not one that inherently serves the public good, the applicant must prove and the board must specifically find that the use

> promotes the general welfare because the proposed site is particularly suitable for the proposed use * * *. Alternatively, the statutory special reasons standard can also be addressed by proof of undue hardship, *i.e.,* that the property cannot reasonably be developed with a conforming use.
>
> [107 *N.J.* at 4 & n. 1, 526 *A.*2d 109.]

Uses that meet the special-reasons standard because of their inherently beneficial nature are generally institutional, as opposed to commercial, uses. Such institutional uses include private schools, hospitals, and public-housing projects. *Id.* at 12–13, 526 *A.*2d 109. Hardship is a straightforward concept: "the *inutility* of the property for the *permitted* uses * * *." *Kramer v. Board of Adjustment,* 45 *N.J.* 268, 286, 212 *A.*2d 153 (1965) (citing *Yahnel v. Board of Adjustment,* 79 *N.J.Super.* 509, 518, 192 *A.*2d 177 (App.Div.), *certif. denied,* 41 *N.J.* 116, 195 *A.*2d 15 (1963)). The "particularly suited" circumstance requires "a finding that the general welfare is served because the *use* is peculiarly fitted to the specific location for which the variance is sought." *Kohl, supra,* 50 *N.J.* at 279, 234 *A.*2d 385 (emphasis added); *see also Medici, supra,* 107 *N.J.* at 24, 526 *A.*2d 109 (explaining formulation of special reasons as requiring proof that "the subject property was particularly suitable for the proposed [prohibited] use").

The few cases that have specifically addressed the standard for granting a conditional-use variance have treated it as if it were indistinguishable from a variance for a prohibited use. In *White Castle Systems v. Planning Board,* 244 *N.J.Super.* 688, 583 *A.*2d 406 (App.Div.1990), *certif. denied,* 126 *N.J.* 320, 598 *A.*2d 880 (1991), the Appellate Division determined that an applicant who had applied to the planning board for conditional-use approval, but who did "not comply with the conditional use lot-width requirement," 244 *N.J.Super.* at 692, 583 *A.*2d 406, was required to apply to the board of adjustment for a use variance and demonstrate proof of special reasons, *id.* at 693, 583 *A.*2d 406. In *Loscalzo v. Pini,* 228 *N.J.Super.* 291, 549 *A.*2d 859 (App.Div.1988), *certif. denied,* 118 *N.J.* 216, 570 *A.*2d 972 (1989), the applicant wished to expand a commercial conditional use. The Appellate Division, reversing the board of adjustment's grant of a variance, observed that the standard of proof for conditional-use variances was the

same as that applicable to use variances. 228 *N.J.Super.* at 300, 549 *A.*2d 859. In *Sugarman v. Township of Teaneck,* 272 *N.J.Super.* 162, 639 *A.*2d 402 (App.Div.), *certif. denied,* 137 *N.J.* 310, 645 *A.*2d 139 (1994), the court affirmed the board of adjustment's grant of a variance to a synagogue to expand its conditional use. The court noted that when an applicant does not comply with all the conditions for a use, a " 'd' variance is required even if the unsatisfied conditions are physical features that ordinarily would require a bulk variance." *Id.* at 171, 639 *A.*2d 402. The court concluded that the synagogue was an inherently beneficial use, and affirmed the board's grant of the variance on the basis that the board had correctly applied the standard for inherently beneficial use variances established in *Sica v. Board of Adjustment,* 127 *N.J.* 152, 164, 603 *A.*2d 30 (1992). *Sugarman, supra,* 272 *N.J.Super.* at 172, 639 *A.*2d 402.

Thus, our courts generally have treated a conditional use that does not comply with all the conditions of the ordinance as if it were a prohibited use, imposing on the applicant the same burden of proving special reasons as it would impose on applicants for use variances. In our view, that standard is plainly inappropriate and does not adequately reflect the significant differences between prohibited uses, on the one hand, and conditional uses that do not comply with one or more of the conditions imposed by an ordinance, on the other hand. In the case of prohibited uses, the high standard of proof required to establish special reasons for a use variance is necessary to vindicate the municipality's determination that the use ordinarily should not be allowed in the zoning district. In the case of conditional uses, the underlying municipal decision is quite different. The municipality has determined that the use is allowable in the zoning district but has imposed conditions that must be satisfied. As evidenced by this record, a conditional-use applicant's inability to comply with some of the ordinance's conditions need not materially affect the appropriateness of the site for the conditional use. Accordingly, the standard of proof of special reasons to support a variance from one or more conditions imposed on a conditional use should be relevant to the nature of the

deviation from the ordinance. The burden of proof required to sustain a use variance not only is too onerous for a conditional-use variance; in addition, its focus is misplaced. The use-variance proofs attempt to justify the board of adjustment's grant of permission for a use that the municipality has prohibited. Proofs to support a conditional-use variance need only justify the municipality's continued permission for a use notwithstanding a deviation from one or more conditions of the ordinance.

### III

The course of judicial development of variance standards reflects the need for criteria that are appropriate for specific types of variances. *See Sica, supra,* 127 *N.J.* at 155, 603 *A.*2d 30 (holding that enhanced standard of proofs for use variances does not apply where use is inherently beneficial); *Burbridge v. Mine Hill Township,* 117 *N.J.* 376, 387–89, 568 *A.*2d 527 (1990) (justifying less restrictive standard for proving special reasons to support expansion of existing non-conforming use than for new prohibited use); *Medici, supra,* 107 *N.J.* at 4 & n. 1, 526 *A.*2d 109 (delineating acceptable special reasons for commercial-use variance). Accordingly, we here establish a standard for conditional-use variances that is appropriate for the purposes and characteristics of conditional uses.

We hold that the proof of special reasons that must be adduced by an applicant for a "d" variance from one or more conditions imposed by ordinance in respect of a conditional use shall be proof sufficient to satisfy the board of adjustment that the site proposed for the conditional use, in the context of the applicant's proposed site plan, continues to be an appropriate site for the conditional use notwithstanding the deviations from one or more conditions imposed by the ordinance. That standard of proof will focus both the applicant's and the board's attention on the specific deviation from conditions imposed by the ordinance, and will permit the board to find special reasons to support the variance only if it is persuaded that the non-compliance with

conditions does not affect the suitability of the site for the conditional use. Thus, a conditional-use variance applicant must show that the site will accommodate the problems associated with the use even though the proposal does not comply with the conditions the ordinance established to address those problems.

The thrust of the proof addressed to the negative criteria is similar. In respect of the first prong of the negative criteria, that the variance can be granted "without substantial detriment to the public good," *N.J.S.A.* 40:55D–70, the focus is on the effect on surrounding properties of the grant of the variance for the specific deviations from the conditions imposed by ordinance. "The board of adjustment must evaluate the impact of the proposed [conditional-] use variance upon the adjacent properties and determine whether or not it will cause such damage to the character of the neighborhood as to constitute 'substantial detriment to the public good.'" *Medici, supra,* 107 *N.J.* at 22 n. 12, 526 *A.*2d 109 (quoting *Yahnel, supra,* 79 *N.J.Super.* at 519, 192 *A.*2d 177 (explaining weighing function of board of adjustment in respect of negative criteria)). In respect of the second prong, that the variance will not "substantially impair the intent and purpose of the zone plan and zoning ordinance," *N.J.S.A.* 40:55D–70(d), the board of adjustment must be satisfied that the grant of the conditional-use variance for the specific project at the designated site is reconcilable with the municipality's legislative determination that the condition should be imposed on all conditional uses in that zoning district.

## IV

We are persuaded that the record supports the grant of a conditional-use variance from the aggregate-side-yard and rear-yard setback requirements for Associates' apartment complex. Associates' site plan complied with the minimum side-yard requirement of twenty feet, but not the aggregate side-yard minimum of thirty percent of lot width, or 150 feet. Associates' proofs satisfy the special-reasons standard by demonstrating that the

apartment use was suited to the proposed site despite its failure to comply with those conditions.

As noted, *ante* at 288, although the property's easterly lot line abuts property containing a non-conforming bus garage, the property's westerly lot line abuts the rear yards of residences fronting on Sand Road. Accordingly, a plan complying with both individual and aggregate-side-yard setback requirements could have provided a twenty-foot westerly side yard and a 130 foot easterly side yard, affording less of a buffer for the Sand Road residences but requiring no variances. In addition, although the proposed site plan provides a thirty-three-foot landscaped buffer along the westerly lot line, the ordinance permits parking within ten feet of the line. Accordingly, the record provides ample support for the board's finding that the proposed site plan, although requiring an aggregate-side-yard setback variance, permits the applicant to provide a larger buffer area than might have been provided by a fully complying plan. Moreover, because the aggregate-side-yard setback variance does not result in any less protection for adjacent residential properties than would a complying plan, the record supports a finding of special reasons to sustain that variance: in the context of Associates' site plan, the site continues to be appropriate for the conditional use notwithstanding the deviation from the aggregate-side-yard setback requirement. *Supra* at 298.

■ We reach the same conclusion in respect of the variance for the rear-yard setback requirement. Because the property is almost 800 feet deep, the ordinance's rear-yard setback requirement of forty percent of lot depth would have required a rear-yard setback of over 300 feet, which the board characterized as "unnecessary and entirely illogical." The board's findings are amply supported by the record, which demonstrates that the property's rear lot line abuts Pascack Road, and the nearest residential dwellings are located across Pascack Road. Accordingly, the record sustains the board's conclusion that the seventy-five-foot rear-yard setback affords an adequate buffer for the residences

north of Pascack Road, and would also sustain a finding that the deviation from the rear-yard setback requirement renders the site no less appropriate for the conditional use than would have been the case if the rear-yard setback complied with the ordinance.

The record also sustains the board's conclusion that the negative criteria were satisfied for both variances.

■ We deal only briefly with Coventry Square's claim that the Board erred in granting the "design waivers" (which were actually "exceptions") concerning roadway and parking specifications. Because the board of adjustment has concurrent jurisdiction over site-plan approval when the proposed development requires approval of a variance, *N.J.S.A.* 40:55D–76b, it also has the power to grant exceptions or waivers from site-plan requirements in appropriate cases. *See N.J.S.A.* 40:55D–51b. We are fully satisfied, as was the Appellate Division, that the Board did not act arbitrarily or capriciously in granting the requested design waivers.

Finally, we note that Coventry Square's attorney informed us by letter that during the pendency of this appeal, Westwood amended its ordinance to provide that apartments are now a prohibited use, not a conditional use, in the zone. Any issues raised by those amendments are not before us and we do not address them.

## V

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, GARIBALDI, HANDLER, POLLOCK, O'HERN, and STEIN—7.

*For reversal*—none.