

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-19-1999

# Cellular Telephone v Zoning Bd. of Ho-Ho-Kus

Precedential or Non-Precedential:

Docket 98-6484

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Cellular Telephone v Zoning Bd. of Ho-Ho-Kus" (1999). *1999 Decisions*. Paper 305.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/305

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 19, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6484

CELLULAR TELEPHONE COMPANY,
d/b/a AT&T Wireless Services, f/k/a Cellular One;
NEW YORK SMSA LIMITED PARTNERSHIP
AND ITS GENERAL PARTNER CELLCO PARTNERSHIP,
d/b/a Bell Atlantic Nynex Mobile;
SMART SMR OF NEW YORK, INC.,
d/b/a Nextel Communications

v.

ZONING BOARD OF ADJUSTMENT OF THE
BOROUGH OF HO-HO-KUS

        New York SMSA Limited Partnership and
        its General Partner Cellco Partnership,
        d/b/a Bell Atlantic Nynex Mobile,

        Appellant

APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

(D.C. No. 97-cv-03408)
District Judge: The Honorable Maryanne Trump Barry

ARGUED JUNE 18, 1999

BEFORE: NYGAARD, STAPLETON, and COWEN,
Circuit Judges.

(Filed November 19, 1999)

Thomas F. Campion, Esq.
Kenneth J. Wilbur, Esq.
Drinker, Biddle & Shanley
500 Campus Drive
Florham Park, NJ 07932-1047

Alison B. Brotman, Esq. (Argued)
Bell Atlantic NYNEX Mobile
180 Washington Valley Road
Bedminster, NJ 07921

 Attorneys for Appellant

David L. Rutherford, Esq. (Argued)
141 Dayton Street
PO Box 5108
Ridgewood, NJ 07451

 Attorney for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge.

This appeal originates from a decision by the Zoning Board of Adjustment of the Borough of Ho-Ho-Kus, New Jersey denying an application by three cellular communication providers for variances necessary to build a wireless communications facility within the Borough. The providers claim that the Borough's decision violates section 704 of the Telecommunications Act of 1996 because: 1) the Zoning Board unlawfully considered the quality of existing wireless service during the decision process; 2) its decision is not supported by substantial evidence; and 3) the decision has the effect of prohibiting personal wireless services. The providers also claim that the Zoning Board's decision violates New Jersey state zoning law. The District Court granted summary judgment in favor of the Zoning Board on all issues. We will affirm in part and reverse in part.

I. Factual Background

The parties have stipulated to the following facts, taken largely from the District Court's opinion. See Cellular Tel.

2

Co. v. Zoning Board, 24 F. Supp. 2d 359 (D. N.J. 1998). Two of the providers, Cellular Telephone Company, d/b/a AT&T Wireless Services, and Cellco Partnership, d/b/a Bell Atlantic Nynex Mobile, are licensed by the Federal Communications Commission to provide wireless cellular telephone service to the Borough of Ho-Ho-Kus, New Jersey. SMART SMR of New York, Inc., d/b/a Nextel Communications, is licensed to provide wireless mobile radio services. On August 2, 1994, AT&T and the Borough entered into a lease for 2,350 square feet of Borough-owned property on which AT&T planned to construct a wireless telecommunications facility. The facility, as contemplated by the lease, would include a wireless communications monopole, associated antennae, and related equipment shelters, all of which would be surrounded by a security fence. Thereafter, Bell Atlantic and Nextel entered into co-location agreements with the Borough, authorized by the AT&T lease, allowing Bell Atlantic and Nextel to install their own antennae on the proposed monopole, and to utilize a portion of the accompanying equipment shelters. AT&T, Bell Atlantic and Nextel are referred to collectively throughout this opinion as the "providers."

The AT&T lease was contingent upon the company acquiring all required zoning variances, special use permits and building permits. Although the proposed site is located in an R-2 residential zone, it is actually part of two larger lots (Lots 3 and 4 in Block 603 of the Borough of Ho-Ho-Kus), which contain, among other things, the Department of Public Works' salt storage barn and accompanying fencing, a motor vehicle fueling area, a public recycling center, and open storage for municipal equipment. The lots do not contain any residences. Two sides of the leased site border public roads, while a third abuts the New Jersey Transit railroad line.

On September 3, 1994, the providers applied to the Borough's zoning official for variances necessary to construct three buildings, a 125-foot monopole with antennae reaching as high as 127 feet, and a six-foot high barbed wire fence. The proposed monopole would be a cylindrical galvanized steel structure measuring three feet in diameter at its base and eighteen inches at its top. The

monopole would support twenty seven antennae, nine for each of the providers, in a 360o array. Maintenance personnel would visit the site approximately once a month, but it would be otherwise unmanned. The zoning official denied the application. The providers then amended their application, reducing the number of equipment shelters from three to two, changing the layout of all planned improvements on the site, and lowering the security fence from six to five feet. The zoning official denied the amended application as well.

The providers next brought both their original and amended applications before the Zoning Board of Adjustment, seeking thirteen variances from the Borough's zoning ordinance. On April 24, 1997, after two and a half years and forty-four public hearings, the Board voted to deny the applications. The Board then memorialized its decision in a thirty-six page resolution adopted on June 5, 1997 (the "Resolution"). The Resolution concluded as follows:

> [T]he public interest which will be served by the proposed monopole is not substantial, as the quality of cellular telephone service already being provided within the Borough of Ho-Ho-Kus is adequate . . . . The Board [also] finds that the site is inappropriate for that use, given its already congested nature, and [the fact that] numerous bulk variances are required, including one related to the required setback of the structure from the property lines. The Board also finds that the construction of the monopole will have a substantially detrimental impact upon the public good and the purpose and intent of the zone plan and ordinance based upon a significant detrimental visual impact, the construction of such a massive structure on a relatively tiny piece of property, and a significant decline in real property values. The Board finds that . . . the balance must be struck in favor of denying the application. The public good being served is not compelling. Due to the nature of the structure, no conditions can be imposed that would reduce the impact, and on balance the negative considerations outweigh the benefits to be obtained.

4

Resolution: Zoning Board of Adjustment, Borough of Ho-Ho-Kus, June 5, 1997 at 35-36, reprinted in Brief for Appellant app. at A177-78.

833<!>On judicial review, the district court granted the Borough's motion for summary judgment, finding that the Board's denial did not have the effect of prohibiting personal wireless services, was supported by substantial evidence, and was based on a proper application of state zoning laws. The providers appealed. We exercise plenary review over the District Court's grant of summary judgment. See Doby v. DeCrescenzo, 171 F.3d 858, 867 (3d Cir. 1999).

## II. Discussion

The providers first claim that the Board's decision has the effect of prohibiting personal wireless services in Ho-Ho-Kus, and thus violates S 704 of the Telecommunications Act of 1996, codified at 47 U.S.C. S 332(c)(7). As part of this claim, the providers argue that the Board had no authority to consider the quality of existing personal wireless service when ruling on their applications. In the alternative, they argue that the Ho-Ho-Kus zoning ordinance, though facially neutral, effectively prohibits personal wireless services in violation of the Telecommunications Act. The providers also claim that the Board's denial violates the Telecommunications Act because it is not supported by substantial evidence. Finally, the providers claim that the Board's denial is invalid because it relies on a misapplication of applicable state zoning laws.

## A. Local Zoning Authority

The Telecommunications Act expressly preserves local zoning authority over the placement, construction and modification of personal wireless service facilities. See 47 U.S.C. S 332(c)(7)(A). Nevertheless, the statute subjects the exercise of local zoning authority[1] to six limitations. First,

_____

1. The statute actually preserves the zoning authority of the states, local governments and instrumentalities thereof. We refer exclusively to "local" zoning authority for simplicity's sake only.

5

local regulation may not unreasonably discriminate among providers of functionally equivalent wireless services. See id. S 332(c)(7)(B)(i)(I). Second, local regulation may not prohibit or have the effect of prohibiting the provision of personal wireless services. See id. S 332(c)(7)(B)(i)(II). Third, local regulators must act on placement, construction and modification applications within a reasonable period of time. See id. S 332(c)(7)(B)(ii). Fourth, all decisions denying a request to place, construct or modify a personal wireless services facility must be in writing and supported by substantial evidence contained in a written record. See id. S 332(c)(7)(B)(iii). Fifth, any person adversely affected by local regulators' final action on a placement, construction, or modification application may seek judicial review in any court of competent jurisdiction. See id. S 332(c)(7)(B)(v). Finally, the statute substantially limits the authority of local officials to regulate personal wireless facilities on the basis of the environmental effects of radio frequency emissions. See id. S 332(c)(7)(B)(iv).

In the course of its long deliberations over the applications at issue, the Board received testimony and other evidence from both the providers and their opponents concerning the quality of existing personal wireless services in Ho-Ho-Kus. A radio frequency engineer for AT&T testified that there were various areas within the Borough where the quality of service was very poor, and other areas where the odds of actually being able to place or receive a call were so low as to render them essentially "no service" areas. See Transcript: March 9, 1995 Ho-Ho-Kus Board of Adjustment Hearing at 124-26, reprinted in Appellant's Brief app. at A438-40. Similarly, a radio frequency engineer for Bell Atlantic testified that his company's cellular service in the area was marginal at best, and generally unreliable. See Transcript: April 13, 1995 Ho-Ho-Kus Board of Adjustment Hearing at 109-11, reprinted in Appellant's Brief app. at A741-43. A Nextel engineer described his company's mobile radio service in the Borough as "almost non-existent." See id. at 169, reprinted in Appellant's Brief app. at A801.

In response, two Ho-Ho-Kus residents presented tape recordings they had made of twelve cellular telephone calls placed from various locations within the Borough. The

recordings apparently demonstrated relatively good
connection and transmission quality with respect to the
twelve calls recorded, and the Board accepted them as
competent evidence that existing wireless service as a whole
was adequate. See Resolution: Zoning Board of Adjustment,
Borough of Ho-Ho-Kus, June 5, 1997 at 13, reprinted in
Appellant's Brief app. at A153; see also, Transcript: May
23, 1996 Ho-Ho-Kus Board of Adjustment Hearing at 59-
89, reprinted in Appellant's Brief app. at A1907-37.

The providers challenged the evidentiary value of the tape
recordings and pointed out that while the residents placed
twelve calls, AT&T's tests included calls from approximately
2,500 locations within the borough. Because AT&T
conducted five such tests, the total data apparently
included at least 12,500 calls. Underscoring further this
dramatic difference in the sample size, the providers point
out that of the residents' twelve calls, only two calls were
placed from the worst service areas. The residents also
made the calls in April when few trees had foliage, a
significant source of interference; they called while
stationary, again avoiding sources of interference; and all of
their calls were made on a Saturday when demand was low,
yet another variable affecting call performance. Finally, the
residents only recorded the uplink, which is picked up by
the more sensitive receiver at a cellular facility and
transmitted to a land-line phone. They did not record the
more problematic downlink that a cellular phone receives
from its much less sensitive antenna. Evidence produced
from the providers' own test calls indicated that most
suffered from some form of technical difficulty.

After weighing the conflicting evidence, the Board
concluded that the quality of existing cellular service within
the Borough and surrounding area was sufficient, and that
there was therefore no legitimate need for the proposed
monopole. See Resolution of the Zoning Board of
Adjustment, Borough of Ho-Ho-Kus, June 27, 1997 at 25,
reprinted in Appellant's Brief app. at A165. The providers
argue, however, that local authorities are barred from
considering quality of service issues when determining
whether and where to permit wireless communication
facilities within their jurisdictions. They contend that the

7

comprehensive body of federal law regulating the telecommunications industry effectively, if not expressly, preempts local authorities from regulating the quality of personal wireless services. They further contend that because judging the quality of wireless services does not concern the physical location and construction of cellular facilities, it is not a legitimate exercise of zoning power, but rather an unlawful intrusion upon the Federal Communications Commission's exclusive regulatory authority.

As an initial matter, we reject the proposition that local zoning authorities are wholly barred from considering the quality of existing personal wireless service. Obviously, local officials must, at a minimum, consider whether wireless service currently exists within their jurisdictions if they are to determine whether rejecting a proposed wireless communications facility would have the effect of prohibiting such service. The providers contend, however, that allowing local officials to go beyond this threshold consideration, and to reject wireless communication facilities based on their own evaluation of existing service, would undermine the Telecommunications Act's twin goals of encouraging rapid deployment of new technologies and providing nationwide seamless cellular service to the public.

Contrary to the providers' arguments, we conclude that barring all local quality-of-service considerations could just as easily undermine the Telecommunications Act's goals as further them. Decisions to grant or deny variances from local zoning ordinances generally require local officials to balance the interests that will be affected by the decision. Indeed, New Jersey law specifically mandates such a balancing approach. Obviously, one of the interests affected by a decision to grant or deny a variance necessary to construct a wireless communications facility is the quality of existing wireless services. A finding that existing service is relatively poor could tip the scale in favor of granting a variance that, absent consideration of current quality, might otherwise be denied.

In so holding, we do not suggest that the discretion of local officials is unlimited. The Telecommunications Act imposes a number of explicit restrictions on the exercise of

8

local zoning authority. For instance, determinations concerning the quality of existing service must be based on substantial, competent evidence and remain subject to judicial review. Additionally, although the Telecommunications Act does not divest local officials of any authority they may have to consider the quality of existing wireless services, neither does it create such authority. Efforts to assess existing quality, and to weigh the benefits of enhancing it against the possible costs, must be authorized by and performed within the parameters of governing state and local law.

Finally, as the Telecommunications Act itself dictates, local officials must always ensure that neither their general policies nor their individual decisions prohibit or have the effect of prohibiting personal wireless services. We interpret this mandate to mean more than simply ensuring that personal wireless services are available somewhere within the relevant jurisdiction, even if they are not available throughout. Thus, we conclude, as did the court in Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999), that local zoning policies and decisions have the effect of prohibiting wireless communication services if they result in "significant gaps" in the availability of wireless services. Building on the Willoth court's analysis, we conclude that there is a "gap" in personal wireless services when a remote user of those services is unable either to connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication. See id. at 641–43. We do not attempt here to define what constitutes a "significant" gap in local wireless services.2 Rather, we will leave it for the

_____

2. There may be any number of factors that a reviewing court may find it necessary to consider when determining whether a significant gap exists, and we make no attempt to enumerate them here. We think it matters a great deal, however, whether the "gap" in service merely covers a small residential cul-de-sac or whether it straddles a significant commuter highway or commuter railway. Unlike a utility such as electrical power, cellular service is used in transit, so a gap that covers
a well-traveled road could affect large numbers of travelers––and the people who are trying to communicate with them. Over the course of a year, the total disruption caused could be quite significant. Here the

district court to determine, if necessary, whether there is a significant gap in service and, if so, whether there are any less intrusive means for closing that gap.

B. The Effect of the Ho-Ho-Kus Zoning Ordinance

As previously noted, construction of the proposed wireless communications facility at the center of this case would require thirteen variances from the Zoning Ordinance of the Borough of Ho-Ho-Kus. The Ordinance, for example, limits the height of radio and television antennae to 50 feet, while the proposed monopole and antennae would be 127 feet high. The Ordinance also includes a "fall down zone" provision that requires the distance between the monopole and all adjacent property lines to be at least as far as the monopole is high. The proposed monopole, however, would stand just 4.25 feet from one adjoining property line and 26.42 feet from another.

The providers argue that because wireless communication antennae must be located above the tree line, a 50-foot height restriction in a locality such as Ho-Ho-Kus, where the prevailing tree line is 70 feet, amounts to an effective ban on wireless facilities. Similarly, they argue that because the fall-down provision limits their proposed facility to sites containing a minimum of 1-1/2 acres in a town where there is virtually no open space, it too has a prohibitory effect. These arguments fail to address the central issue, however. The Telecommunications Act bars local regulation that prohibits or has the effect of prohibiting personal wireless services, not the facilities that provide those services. Under the right conditions, it may be possible to provide an adequate level of personal wireless services to a particular community solely through facilities located outside that community. We

_____

proposed tower will be installed next to a railway and several roads that the cellular companies described as significant commuter routes. According to the cellular companies' data, signal strength on Route 17, as it passed through Ho-Ho-Kus, fell well below what the companies say is acceptable service. We suggest the district court consider such factors in determining what constitutes a significant gap in service.

are not prepared to hold that every community must permit wireless communication facilities somewhere within its borders regardless of the need for such facilities, nor do the facts of this case require us to decide the issue now.

The issue here is whether the Board's rejection of the proposed wireless communication facilities has the effect of prohibiting personal wireless services. The providers acknowledge that some level of personal wireless service currently exists in Ho-Ho-Kus, although the level of service provided by each ranges from spotty to unreliable to non-existent. For its part, the Board has assessed the quality of existing service and determined that the improvements offered by the proposed facility are outweighed by its negative impact on the community. In assessing overall quality, however, the Board never specifically determined whether there are significant gaps in the current service. Consequently, we will reverse the district court's summary judgment on the issue of prohibitory effect.

While we have held that local officials are not barred from considering the quality of existing wireless service and, in the first instance at least, whether there are any significant gaps in that service, we note that their findings on this issue are not reviewed under the substantial evidence standard. That standard applies only to decisions denying requests for authorization to place, construct or modify personal wireless facilities. In contrast, the statutory bar against regulatory prohibition is absolute, and does not anticipate any deference to local findings. See 47 U.S.C.A. S 332(c)(7)(B)(i)(II). Because we believe the communication providers have presented evidence that there may be significant gaps that only the proposed facility can close, we will reverse summary judgment on the issue of prohibitory effect.

C. The Substantial Evidence Challenge

The Telecommunications Act requires that any decision denying a request to place, construct, or modify personal wireless service facilities be in writing and supported by substantial evidence contained in a written record. See 47 U.S.C. S 332(c)(7)(B)(iii). Substantial evidence "does not

11

mean a large or considerable amount of evidence,`but rather such evidence as a reasonable mind might accept as adequate to support a conclusion.' " Pierce v. Underwood, 487 U.S. 552, 565, 108 S. Ct. 2541, 2550 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)); see also Omnipoint Corp. v. Zoning Hearing Bd, 181 F.3d 403, 408 (3d Cir. 1999). A reviewing court's task is to determine whether there is substantial evidence in the record as a whole to support the challenged decision. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 491, 71 S. Ct. 56 (1951). It has no power either to weigh the evidence contained in that record or to substitute its own conclusions for those of the fact-finder. See Williams, 970 F.2d at 1182. Nevertheless, if the record as a whole contains conflicting evidence, the fact-finder must adequately explain its reasons for rejecting or discrediting competent evidence. See Benton v. Bowen, 820 F.2d 85, 88 (3d Cir. 1987).

In the context of S 332(c)(7)(B)(iii), the decision process itself is governed by applicable state and local zoning laws. The reviewing court's task is to determine whether the decision, as guided by local law, is supported by substantial evidence. See Omnipoint Corp., 181 F.3d at 408. Under New Jersey law, local zoning officials must weigh the positive and negative factors associated with a requested zoning variance and determine whether, on balance, those factors weigh in favor of granting or rejecting the request. Thus, the reviewing court's task is to determine whether the findings of local officials concerning the positive and negative factors, and their relative weight, is supported by substantial evidence.

The providers do not claim that the record, as a whole, lacks substantial evidence to support the Board's decision. Rather, they challenge two of the Board's specificfindings as being unsupported by substantial evidence. First, they challenge the Board's finding that existing personal wireless service is adequate, arguing that it is based on incompetent evidence. Second, the providers challenge the Board's finding that the proposed monopole would have a substantial detrimental impact on the value of surrounding properties. Again, they argue that the Board's detrimental impact finding relies on incompetent evidence.

12

During the public hearings held to consider the proposed wireless communications facility, the Board heard from three experts who testified about the proposed monopole's economic impact on surrounding properties. The providers presented two experts who testified that the monopole would have no detrimental economic impact, while their opponents presented one expert who testified to the contrary. The providers' experts relied, at least in part, on their conclusions that the very visible presence of telecommunications towers in other New Jersey communities had had no discernable effect on the value of nearby upscale homes. These experts reasoned that if the visibility of communications towers had no effect on the "high-end" homes they had studied, it would not adversely effect the value of the more moderately priced homes found in Ho-Ho-Kus. The opponent's expert disagreed. Relying on a "paired-sales" analysis (i.e., comparing the sale price of a home from which a communications tower was visible to the sale price of a similar home from which no tower was visible) he presented evidence tending to show that the proposed monopole would, in fact, adversely impact the value of some Ho-Ho-Kus homes.

After hearing all the evidence, the Board chose to give greater credence to the opponents' expert than to the providers' experts. The Board explained that it favored the opponents' expert in part because the communities studied by the providers' experts were not sufficiently similar to Ho-Ho-Kus, and in part because the opponents' expert's paired-sales methodology was superior to the logical extrapolation on which the other experts had relied.

On appeal, the providers challenge the scientific validity of the opposing expert's study. They argue that it included too few samples and too many subjective adjustments for factors other than the visibility of nearby communication towers that may have explained differences in sales price. They also note that the paired sales considered by the opponents' expert occurred in one of the very same towns the providers' expert had studied. When evaluating the providers' evidence, the Board concluded that dissimilarities between the studied town and Ho-Ho-Kus rendered the evidence unreliable. Yet, in concluding that

the opposing evidence was more reliable, the Board did not address the issue of community dissimilarities at all. The providers argue that the Board cannot have it both ways, and that if the claimed dissimilarities render their evidence unreliable, they must render the opposing evidence unreliable as well.

While acknowledging the theoretical possibility that dissimilarities between two towns could render a comparative study based on one methodology less reliable than a study based on another, wholly different methodology, we are not certain how that would be true in this case. In any event, the Board did not discount the providers' evidence solely on the basis of dissimilarities between the relevant towns, but also because it found that the opposing evidence was based on a more reliable methodology. The only issue is whether it was reasonable for the Board to do so. We conclude that it was. Moreover, our decision does not turn on any single factor that the Board may have found weighed against approving the proposed facility. The Board considered a number of other factors, including the proposed facility's purely aesthetic impact on surrounding properties and the adverse effects approval would have on the purpose and intent of the Borough's zone plan and ordinance. The district court ruled, and we agree, that the Board's findings with respect to these other negative factors were supported by substantial evidence.

The providers also claim that there is no substantial evidence to support the Board's finding that existing personal wireless service in the Borough is adequate. As discussed in part II-A of this opinion, supra, the providers presented the testimony of three separate experts concerning the various inadequacies of their respective services. Two local residents opposed to the proposed facility presented tape recordings of twelve cellular telephone calls they made from various locations within the Borough. The opponents claimed, and the Board agreed, that the tape recordings demonstrated a level of existing service "sufficient to properly serve the public good." See Resolution at 25, reprinted in Appellant's Brief app. at A165. In reaching that conclusion, the Board also relied on

14

the providers' admission that there were no "no-service" areas[3] within the Borough, and only three areas where the chances of getting a "no-service light"[4] were very high.

The district court found, as do we, that the tape recordings made by non-expert local opponents of the proposed facility were too insubstantial to discredit the expert testimony presented by the providers. Nevertheless, the district court upheld the Board's decision, finding that the "plaintiffs' own expert witnesses testified--at best -- only that there were some gaps in service within the Borough, not that service is unavailable." Cellular Telephone Company v. Zoning Bd. Of Adjustment, 24 F. Supp. 2d 359, 372 (E.D. Pa. 1998). Holding as we do that the district court must determine whether those service gaps are significant, we cannot agree that the expert testimony in this record supports a finding that existing wireless service within the Borough is adequate.

Moreover, our own review of the record indicates that the Board either misunderstood or mischaracterized the expert testimony on the issue of existing service. During the public hearings, the providers' experts rated the quality of existing wireless services in the Borough using an industry standard scale ranging from one to five. They testified that a five represents land-line quality service, meaning participants in a cellular telephone call will not hear any background static. At level four, there may be some static, but the conversation is basically unimpeded. At level three, static is constant and can impede conversation to the point of making individual words unintelligible. At level two, whole sentences are lost and intelligible conversation requires constant repetition and clarification. At level one, service is essentially non-existent because even though a connection may be made, any conversation would be unintelligible. See Transcript: April 13, 1996 Ho-Ho-Kus

_____

3. A "no-service" area is an area in which it is not possible to establish a cellular connection at any time, under any circumstances.

4. In contrast to a "no-service" area, a "no-service light" on a cellular telephone simply informs the user that she cannot establish a connection at that particular time, under the then existing calling conditions.

Board of Adjustment Hearing at 114–115, reprinted in Appellant's Brief app. at A750–51.

Though the voluminous record produced during the Borough's 44 public hearings is somewhat difficult to parse, the providers' experts appear to have rated existing wireless service in Ho–Ho–Kus at level three for installed mobile phones (i.e., car phones), and somewhere between levels one and two for hand–held portable phones. See id. at 116, reprinted in Appellant's Brief app. at A749. Thus, it may be factually correct that there are no "no–service" areas and only three areas in which cellular service users face a high likelihood of getting a "no–service" light. But there is also substantial, unrefuted evidence in the record that even if a cellular caller is able to make a connection from certain locations, any subsequent attempt at conversation will be difficult at best, and virtually impossible for users of the hand–held portable phones that dominate the market today. Thus, based on this record, we conclude that there is no substantial evidence to support the Board's conclusion that the current level of personal wireless service in Ho–Ho–Kus is adequate.

While the Board considered several factors that weighed against approval, the only factor it considered with the potential to weigh in favor of approving the proposed facility was the adequacy of existing service. In other words, absent a finding that existing service was inadequate, or that the public would benefit by enhancing that service, any negative factor, no matter how slight, would have tipped the balance in favor of rejection. Because the Board'sfinding that existing service is adequate is not supported by substantial evidence, we will reverse the district court's summary judgment on this issue.

D. State Zoning Law

In New Jersey, the power of zoning boards of adjustment to grant variances is prescribed by state statute. See N.J. STAT. ANN. S 40:55D–70 (West Supp. 1999). Under that statute, a board's power to grant certain variances, including a conditional–use variance, from the local zoning ordinance is subject to certain limitations. Two are relevant

16

here. First, there must be "special reasons" for granting the variance. Id. S 40:55D-70(d). Second, the local board may not grant a variance without a showing that it "can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." Id. New Jersey's courts refer to these limitations as creating "positive" and "negative" criteria that must be satisfied before a variance can be granted. See Sica v. Board of Adjustment, 127 N.J. 152, 156, 603 A.2d 30, 32 (N.J. Sup. Ct. 1992). If the proposed use is deemed "inherently beneficial," the positive criteria requirement is automatically satisfied. Nevertheless, once the positive and negative criteria are established, they must still be balanced against one another. See id. at 164, 603 A.2d at 36-37.

The New Jersey Supreme Court has provided local boards with a four step procedure for balancing positive and negative criteria. First, the board should identify the public interest at stake and determine, in the general scheme of public importance, whether or not it is compelling. Second, the board should identify the detrimental effects of granting the variance and determine whether they are only minimal or more severe. Third, the board should reduce any detrimental effects, if possible, by imposing reasonable conditions on the proposed use. Finally, the board should weigh the positive against the negative criteria and determine whether, on balance, granting the variance would be a substantial detriment to the public good. See id. at 165-66, 603 A.2d at 37.

The providers raise several challenges to the Board's balancing of the positive and negative criteria in this case. First, they claim that in evaluating the positive criteria, the Board erroneously focused on the proposed facility's deviations from the relevant conditions imposed by the zoning ordinance. In their view, the positive criteria issue turns on the particular benefits of placing the facility at the proposed site, not on the extent to which it deviates from applicable zoning conditions. We disagree.

In Coventry Square, Inc. v. Westwood Zoning Bd. of Adjustment, 138 N.J. 285, 650 A.2d 340 (1994), the New

17

Jersey Supreme Court held that the standard for establishing the "positive" criteria required under New Jersey zoning law depends on the type of variance at issue. Where, as here, a variance is necessary to permit a non-conforming conditional use, the applicant need only prove that the site continues to be suitable for the proposed use despite its failure to comply with one or more conditions. See id. at 298–99, 650 A.2d at 346–47. The Coventry court explained that:

> [the conditional-use] standard of proof will focus both the applicant's and the board's attention on the specific deviation from conditions imposed by the ordinance, and will permit the board to find special reasons to support the variance only if it is persuaded that the non-compliance with conditions does not affect the suitability of the site for the conditional use.

Id. at 298–99, 650 A.2d at 346–47. Thus, satisfying the positive criteria for a non-conforming conditional use appears to turn on its deviation from the applicable conditions, not on the benefits of locating it at the proposed site. Nevertheless, New Jersey law still required the Board to consider the benefits of the proposed facility at the balancing stage of its analysis. The record clearly shows that the Board did so, and that it found the benefits of locating the proposed facility at the proposed site to be outweighed by the negative consequences.

The providers' remaining challenges are essentially derivative of the Telecommunications Act claims that we have already resolved. First, they claim that the Board erroneously dismissed expert testimony that the proposed monopole would have no detrimental impact on the value of surrounding homes, and thus gave too much weight to the negative criteria. We have already held that the Board's findings on this issue were supported by substantial evidence. Second, they renew their claim that the Board had no authority to evaluate the quality of existing wireless service, much less determine that it is adequate, and to discount the positive criteria accordingly. Again, we have already held that the Board was not barred from evaluating the quality of existing wireless service, though its discretion in that area is subject to limitations. Finally, the providers

18

claim that the Board's assessment of existing wireless service, and thus the weight given to the positive criteria, is erroneous because it improperly dismisses expert testimony, and relies instead on incompetent evidence. As we have already noted, we agree with the providers on this point. Consequently, we must reverse the district court's summary judgment on the communication provider's state law claim. If, on remand, the Board reaches the balancing stage, it must adjust the weight given to the positive criteria (i.e., the public benefit of enhancing personal wireless services in and around Ho-Ho-Kus) based on a proper evaluation of existing service, and in compliance with applicable state law.

III. Conclusions

In sum, we reverse the district court's summary judgment on both the Telecommunications Act and state law claims. We affirm its ruling that the Board was not barred from considering the quality of existing personal wireless service, and that its findings regarding the proposed monopole's economic impact on surrounding properties was supported by substantial evidence. We also conclude that the Board correctly identified the factors affecting the positive criteria necessary to approve a conditional-use variance under New Jersey law.

We remand to the district court with instructions that it remand for the Board to reconsider the proposed facility in compliance with this opinion. In doing so, we note that the Telecommunications Act requires the Board to act "within a reasonable period of time." 47 U.S.C. S 332(c)(7)(B)(ii). We also note that the Board took two-and-a-half years to reach a final decision on the providers' original request to build the proposed facility. The extensive record developed during prior proceedings should significantly streamline the process of reconsideration, and any undue delay in reaching a decision could justify injunctive relief in favor of the providers.

If, after reconsideration, the Board approves the proposed facility, this matter will have reached its final end. If, however, the Board rejects the proposed facility for a

second time, its decision will remain subject to nondeferential review under the "effect of prohibiting" standard. The district court will then have to determine whether there are any significant gaps in existing personal wireless services. If significant gaps exist, the court must then determine whether the proposed facility willfill those gaps. We think it worth noting, however, that the Telecommunications Act does not abrogate local zoning authority in favor of the commercial desire to offer optimal service to all current and potential customers. Hence, if the district court ultimately finds significant gaps in existing service, the providers still bear the burden of proving that the proposed facility is the least intrusive means of filling those gaps with a reasonable level of service.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

20